Opinion for the Court filed by Circuit Judge MIKVA.
Opinion concurring in part and dissenting in part filed by Circuit Judge STARR.
MIKVA, Circuit Judge:
This case calls on us to review two rulings by the district court in the complex bankruptcy reorganization proceedings of AOV Industries and its subsidiaries (collectively, “AOV” or “Debtor”). In an Order and Opinion of July 26, 1983, 31 B.R. 1005 (D.D.C.), the district court upheld the bankruptcy judge’s confirmation of Debtor’s Chapter 11 reorganization plan (“the Plan”). Appellants Hubert Bruce (“Bruce”), founder and now creditor of AOV, along with Hawley Fuel Coalmart and Hawley Fuel Coal (collectively, “Haw-ley”), also creditors, renew their contention that the Plan was impermissibly confirmed. They both seek complete reversal of the Plan; Hawley also asks, in the alternative, for modification of the provisions affecting its claim so as to bring the Plan into compliance with the Bankruptcy Code. 11 U.S.C. § 101 et seq. (1982) (“the Code”).
By necessity, appellants also ask this court to reverse the district court’s ruling of September 27, 1984, 43 B.R. 468 (D.D. C.), which held that the reorganization has been substantially consummated and that challenges to the confirmed Plan are moot. Our agreement that many of the actions taken over the past three years to implement the Plan are irreversible leads us to affirm in major part on mootness grounds; consequently, we are unwilling to reverse the confirmation ab initio. But because less drastic action is available to correct an error made in assessing appellant Hawley’s claims, we reverse in part and fashion a remedy suited to the unusual circumstances of this case.
*1142 I. Background
A. Facts
AOV was founded in 1976 to satisfy the increased European demand for coal, which was brought about by the sharp rise in the price of OPEC oil. Its founder was Hubert Bruce; its principal officers, later owners, were Bruce’s son Mark and son-in-law, J. Richard Knop. By 1981 AOV had developed into an integrated group of coal mining, processing, exporting, and trading companies, with an annual revenue of approximately $335 million. Much of its success in the European market was attributable to Knop’s relationship with the West German firm of Steag Handel GmbH (“Ste-ag”), which served as AOV’s exclusive overseas marketing agent. In addition to its sales efforts on behalf of AOV, Steag prefinanced a substantial amount of AOV’s coal purchases, making it one of the company’s most important creditors.
In early 1981, AOV embarked on a major expansion of its port facilities in Morehead, North Carolina and Camden, New Jersey. A critical shortage of working capital needed to carry out the project led AOV to negotiate the sale of a 50% interest in the company to an Australian firm, H.C. Sleigh, Ltd. (“Sleigh”). A letter of intent, stating that Sleigh would acquire a 50% interest in AOV by purchasing $20 million worth of stock, was signed on January 28, 1981, and a Stock Purchase Agreement was executed on August 18, 1981. Most of the shares — $17 million worth — came from the AOV treasury, and the rest were sold by Bruce and Knop. The role played in these arrangements by the law firm of White & Case, which later became AOV’s bankruptcy counsel, is a matter of some dispute. At a minimum, however, White & Case acknowledges that it represented Sleigh in premerger Hart-Scott-Rodino (antitrust) and Commerce Department filings, and also performed a due diligence review for Sleigh of AOV’s corporate records.
As the new 50% owner, Sleigh made sweeping changes in AOV to consolidate its control. Sleigh and Steag each agreed to lend the company $3 million, but only if Mr. Knop resigned as AOV president. After Knop’s removal, a Sleigh director, Max Bonner, was installed as president and chief executive officer. The composition of the AOV Board of Directors was also changed to give Sleigh effective control of the company.
Less than a month after the shift in power, AOV filed for bankruptcy. At debt- or’s request, White & Case was appointed general bankruptcy counsel on December 22, 1981. Subsequently, protracted negotiations among AOV, Sleigh, Steag, and the seven creditors’ committees began in an effort to develop a reorganization plan. A brief flurry of activity followed: AOV filed a $25 million suit against Steag, claiming that the two companies had engaged in a de facto joint venture relationship; the bankruptcy court authorized retention of a consulting firm to value and plan for disposal of AOV’s assets; and Sleigh hired a management consultant to succeed Max Bonner as AOV president.
One additional piece of litigation completes the background pertinent to this appeal. In June 1982, Hawley filed suit against Steag in the district court for the Southern District of New York, seeking direct payment of AOV’s indebtedness. Hawley had supplied an AOV subsidiary with a substantial amount of coal on credit, and the complaint alleged that it received a pre-bankruptcy telex, sent on behalf of Ste-ag, in which Steag purportedly guaranteed that Hawley would be paid in full if it would continue to supply coal. In March 1985, Hawley won a jury verdict for principal and interest totaling $1.8 million, the full amount of its claim. The district court, however, granted Steag’s motion for judgment notwithstanding the verdict. Hawley Fuel Coalmart v. Steag Handel, GmbH, 614 F.Supp. 361 (S.D.N.Y.), reversed, 796 F.2d 29 (2d Cir.1986). The importance of this disposition is discussed in Part IV(B) below.
B. Procedural History
A Plan Contribution Agreement concluded in April 1983 between AOV, Steag, and *1143 Sleigh served as the basis for the Debtor’s Disclosure Statement and Reorganization Plan. The agreement called for renunciation of over $51 million in claims by the two creditor firms, plus their commitment to make contributions in excess of $4.5 million to satisfy the outstanding claims against the Debtor. In exchange, Sleigh would receive 100% of the AOV stock, and Steag would take a $2.6 million security interest in AOV’s assets.
One of the critical parts of the Plan was the so-called “release provisions,” through which Steag and Sleigh agreed to make a total of $3 million of the $4.5 million fund available to the unsecured creditors. The money was made available subject to a condition: before the unsecured creditors could receive their pro rata share, they were required to release all of their pending claims against Sleigh and Steag. In addition, none of the money became available until all but a few selected creditors submitted a release. The Plan made the money available:
on the Consummation Date if releases are received from all creditors except for Hawley Fuel Coal, Inc., Ambrose Branch Coal Co., their affiliates and any other creditor or creditors whose claims, when taken as a whole, do not exceed $300,000.
Amended Plan, Articles VIII and IX (emphasis added). Hawley’s release thus was not necessary before this part of the Plan could take effect; it was still necessary for appellant, Ambrose Coal, and other “non-releasing” creditors to release their claims, though, before they were entitled to their pro rata share. By the terms of the Plan, these creditors had three years from the consummation date to tender their releases.
The AOV creditors voted overwhelmingly to accept the Plan, with roughly 90% of the creditors in each of the eight classes registering their approval. Of the more than 500 creditors, only three filed objections to the Disclosure Statement and Amended Plan in bankruptcy court: the Indiana Department of Revenue (which chose not to pursue its objection), Bruce, and Hawley. After three days of hearings, the bankruptcy judge delivered a lengthy bench opinion and an Order dated June 30, 1983, confirming the Amended Plan. Taking note of Bruce’s continued objections, particularly his challenge to the bankruptcy court’s jurisdiction to render a binding judgment, the judge certified the case to the district court pursuant to bankruptcy Emergency Rule §§ (e)(2)(A)(ii) and (e)(3). Bruce and Hawley also directly appealed the confirmation to the district court; the appeal and certification were subsequently consolidated for review.
The district court held two days of hearings, then affirmed the Plan confirmation in the first decision which is on appeal here. In re AOV Industries, 31 B.R. 1005 (Bankr.D.D.C.1983). As a threshold matter, the district judge rejected Bruce’s jurisdictional challenge, which was premised on the Supreme Court’s decision in Northern Pipeline Construction Co. v. Marathon Pipe Line, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The court held that in this type of case the bankruptcy court had the authority to make final decisions on the claims, subject to appellate review by the district court. Furthermore, the court found no deprivation of due process because of the consolidation of the certification and appeal proceedings.
On the merits, the district judge subjected the findings of the bankruptcy court to a “substantial evidence” standard of review, relying on this court’s decision in Kalaris v. Donovan, 697 F.2d 376 (D.C.Cir.), cert. denied, 462 U.S. 1119, 103 S.Ct. 3088, 77 L.Ed.2d 1349 reh’g denied, 463 U.S. 1236, 104 S.Ct. 30, 77 L.Ed.2d 1451 (1983). He held, inter alia, that the Plan did not treat Hawley differently than it did other members of its class, in violation of 11 U.S.C. § 1123(a)(4); that the Plan’s release provisions did not constitute an impermissible discharge of non-petitioning third parties, contrary to Bankruptcy Code § 524(e); that the release provisions and the allocation of all the AOV stock to Sleigh were consistent with the Code’s *1144 good faith requirement, contained in § 1129(a)(3); and that the confirmed Plan was consistent with the “best interests of the creditors” test. The court found that the Plan satisfied this test because no impaired creditor would receive less under the Chapter 11 Plan than it would in a Chapter 7 liquidation. 31 B.R. at 1008-13; see 11 U.S.C. § 1129(a)(7) (1982).
The district court also rejected Bruce’s claim that the confirmation of the Plan was tainted by the involvement of White & Case. Appellant said that the law firm had a conflict of interest because of its previous representation of Sleigh. In addition, Bruce asserted that White & Case could not exercise independent judgment on behalf of AOV because its legal fees were guaranteed by Sleigh; under the Plan, the creditor agreed to pay the fees to the extent they were not recoverable from the Debtor. Bruce contended that these conflicts violated the good faith requirement of § 1129(a)(3). The district judge found no merit in any of these arguments. 31 B.R. at 1011.
Under Article II of the Plan, consummation could not take place until there were no appeals of the confirmation pending. Even though both Bruce and Hawley had appealed from the district court ruling, the bankruptcy court granted Debtor’s petition and ordered consummation on September 12, 1983. In re AOV Industries, No. 81-00617 (D.C.Bankr.1983). The judge determined that a rejection of the provision that barred consummation while appeals were pending, in favor of the terms of the separate Plan Contribution Agreement (which included no such limitation), “[would] not materially or adversely affect the interests of creditors and is, in fact, in the best interest of creditors.” Id. at 1. Bruce’s request to this court for a stay of consummation was denied three days later.
On December 2, 1983, the bankruptcy court ruled on the final compensation applications filed by the parties that had taken part in the reorganization; the total authorized accounting and legal expenses for the period between filing and consummation came to $3.25 million. The district court affirmed the fee award in the first part of an order and opinion issued on September 27, 1984. In re AOV Industries, 43 B.R. 468, 471-75 (Bankr.D.D.C.1984). Appeal from that judgment is pending before this court in a separate action. In re AOV Industries, No. 84-5766 (argued Apr. 10, 1986).
After the appeals to this court from the July 1983 confirmation order had been briefed on the merits, but prior to oral argument, AOV filed a motion to dismiss, claiming that substantial consummation had rendered the appeals moot. The matter was remanded to the district court for expeditious consideration of the motion, and a hearing was held on August 1, 1984. The second part of the district court’s September 27 opinion contained its findings and conclusions on the mootness issue. 43 B.R. at 475-80. The court held that the asset transfers made pursuant to the consummation order were made in good faith within the meaning of Code § 363(m), and therefore were irreversible. As for invalidation of particular provisions of the Plan or its reversal in toto, the conclusion of the district court was unequivocal:
[B]ased on the record before it, the Court finds that the Plan has been so far consummated that effective relief is now impossible, and that to disturb or modify the same now would create a legal nightmare not contemplated by the Bankruptcy laws nor any competent authority known to this Court.
43 B.R. at 478. Thus, the district court agreed that the appeal of the Plan’s confirmation was moot.
This court heard oral argument on March 8, 1985. In view of serious concerns raised at that time regarding the conflict of interest issue, we granted Debtor counsel’s request for supplemental briefing. Submissions were filed by White & Case, Bruce, and the Disbursing Agent. The record before us is now complete, and we turn to the issues presented.
*1145 II. THRESHOLD ISSUES
A. Jurisdiction
We first consider Bruce’s claim that the bankruptcy court did not have jurisdiction to decide this case. He claims that the bankruptcy decision violated the Supreme Court’s command in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 785 (1982), by resolving non-bankruptcy law questions. Bruce says that the district court then compounded the error by giving undue deference to the bankruptcy court’s conclusions, thus tainting the decision now before this court.
In Marathon, the Court struck down the jurisdictional provisions of the Bankruptcy Reform Act of 1978. Pub.L. No. 95-598, 92 Stat. 2549 (1979); see 458 U.S. at 87, 102 S.Ct. at 2880. That Act gave the bankruptcy courts jurisdiction over all “civil proceedings arising under Title 11 or arising in or related to cases under Title 11.” 28 U.S.C. § 1471(b) (1976 ed., Supp. IV) (emphasis added); see also id. § 1471(c). In a plurality opinion, the Court found that this language “impermissibly removed most, if not all, of ‘the essential attributes of the judicial power’ from the Art. Ill district court, and ... vested those attributes in a non-Art. Ill adjunct.” 458 U.S. at 87, 102 S.Ct. at 2880. The Court therefore held that the grant of authority to the bankruptcy courts was unconstitutionally broad.
After Marathon, the Judicial Councils of the various circuit courts of appeal passed an Emergency Rule that allowed the bankruptcy courts to continue to hear cases. Bankruptcy judges were permitted to make dispositive dispositions (subject to district court review) on “core” bankruptcy proceedings, and to engage in factfinding and make recommendations in “related proceedings.” See White Motor Corporation v. Citibank, 704 F.2d 254, 256-57 (6th Cir.1983) (discussing Emergency [“Interim”] Rule); see also 1 Collier on Bankruptcy ¶ 3.01(1)(A)(vi) (15th King ed. 1985). The distinction drawn by the Emergency Rule between related and core proceedings was adopted by Congress on June 28, 1984, in the Bankruptcy Amendments and Federal Judgeship Act of 1984. Pub.L. No. 98-353, 98 Stat. 340, codified at 28 U.S.C. § 157; see generally 1 Collier on Bankruptcy at II 301(2).
Bruce claims that in this case the bankruptcy court was presented with a “related proceeding.” He says that the court im-permissibly made a binding disposition on the acceptability of the Debtor’s Disclosure Statement and on the confirmation of the Plan, actions that he claims can only be taken by a district court. Appellant argues that these actions were outside the core of normal bankruptcy proceedings because they involved the release of Sleigh and Steag (entities other than the bankrupt debtor) from allegedly “non-bankruptcy claims” — those held by one creditor against another creditor. Bruce has separate, outstanding claims against both of these companies, and says that the confirmation of the statement and Plan significantly affects his claims. Appellant asserts that this is prohibited by Marathon because it allows article I courts to influence cases that can only be resolved by an article III tribunal. He never specifies, however, how his claims are affected.
We reject Bruce’s argument and his reading of Marathon. The approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law; appellant cites no authority for the notion that the court’s actions were “related” proceedings within the meaning of the Emergency Rule or the 1984 Bankruptcy Amendments. See 28 U.S.C. § 157(b)(2)(L) (core proceedings include “confirmations of plans”); Emergency Rule § (d)(3)(A) (“related proceedings do not include ... matters concerning the administration of the estate ... [or] proceedings in respect to the confirmation of plans”). Although the bankruptcy court’s decision may have an impact on claims outside the scope of the immediate proceedings, we do not read Marathon and its progeny to prohibit all bankruptcy court decisions that may have tangential effects. The expansive reading *1146 of Marathon urged on us by Bruce would limit the power of these article I courts to a far greater degree than we believe Congress or the Supreme Court intended.
Accordingly, we find that the bankruptcy court had jurisdiction to approve the Disclosure Statement and the Plan. The district court ruling on this issue is affirmed.
B. Standard of Review
Bruce also makes a vague allegation that the district court applied the wrong standard of review when analyzing the bankruptcy court decision. The claim is that the district judge should have engaged in de novo review of the confirmation. According to Bruce, the district judge could only have discharged his oversight responsibility by conducting a full hearing, complete with documentary evidence and witnesses.
In Marathon, the Court found that a district court could not exercise sufficient control over a bankruptcy court’s factfind-ing when it restricted itself to a “clearly erroneous” review standard. 458 U.S. at 78-79, 84-86, 102 S.Ct. at 2875, 2878-79. That case, however, involved the adjudication of state law claims; the Court did not say whether this conclusion also applied to cases arising under federal law. More importantly, the plurality opinions did not specify what legal standard the district court should adopt when considering bankruptcy appeals.
The minimum level of scrutiny that the district judge must afford has not been definitely settled by the case law. The district court in this case therefore applied a relatively exacting standard: it examined the confirmation to see if it was supported by “substantial evidence.” 31 B.R. at 1008, citing Kalaris v. Donovan, 697 F.2d 376 (D.C.Cir.), cert. denied, 462 U.S. 1119, 103 S.Ct. 3088, 77 L.Ed.2d 1349, reh’g denied, 463 U.S. 1236, 104 S.Ct. 30, 77 L.Ed.2d 1451 (1983). In Kalaris, this court determined that an article I administrative board (the Labor Department Review Board) was not operating beyond its constitutional authority because, inter alia, the reviewing court provided a level of review more demanding than the “clearly erroneous” standard. 697 F.2d at 386-87 & n. 43. The court implied that as long as a more exacting level of scrutiny was imposed, the Review Board was not being “vested” with article III powers. Id. at 387.
We hold that the district court’s use of the substantial evidence standard satisfies the Marathon requirements. We find no merit in Bruce’s contention that de novo review is required, as opposed to permissible. Cf. Emergency Rule (e)(2)(B) (“In conducting review, the district judge may hold a hearing ... and need give no deference to the findings of the bankruptcy judge.” (emphasis added)) Appellant’s argument seems to be premised on the notion that this was a related proceeding; as discussed above, we reject this assertion. Bruce also does not explain why the court should abandon its normal presumption that, absent statutory authorization, de novo review should not be presumed. See Chandler v. Roudebush, 425 U.S. 840, 861-62 & n. 37, 96 S.Ct. 1949, 1959-60, & n. 37, 48 L.Ed.2d 416 (1976) (discussing presumption against de novo review).
In light of this presumption, we need not decide whether the district judge could have applied a different standard of review than the one he did. We only hold that the district court satisfied its oversight responsibility, and that appellant’s arguments to the contrary are rejected.
III. Mootness
AOV’s motion to dismiss the appeal for mootness rests on two arguments. Invoking the provisions of Bankruptcy Rule 805 (how Rule 8005), AOV argues that appellants’ failure to secure a stay from the consummation order automatically rendered good faith transfers irreversible, thus barring this court’s consideration of the merits of the transfers. Second, affidavits filed by counsel for Sleigh and the Disbursing Agent attest to the “substantial consummation” of the Plan within the meaning of 11 U.S.C. § 1101(2) (“substan *1147 tial consummation” defined as, inter alia, the distribution of substantially all property under the plan). Debtor contends that owing to the comprehensive change in circumstances brought about by the consummation, this court is incapable of granting effective relief, and that the appeals are therefore moot.
Former Bankruptcy Rule 805 said that a referee or the district court could stay the effect of a judgment pending appeal “to protect the rights of all parties in interest.” If, however, the judgment is not stayed, the rule provided that good faith transfers were not affected by the reversal or modification of the order on appeal. This provision, although deleted from the text of new Rule 8005, is preserved in the Advisory Committee Note. See also 11 U.S.C. §§ 363(m), 364(e) (1982).
As amply illustrated by the present reorganization, the practicalities of bankruptcy proceedings require such a rule. Here the district court was presented with strong evidence that the Plan had been substantially implemented: payments to priority creditors had been made; cash settlements with banks and agency creditors had been completed; and large blocks of stock had been sold to independent third parties. In fact, the Disbursing Agent testified that “the entire Plan has been implemented.” See 43 B.R. at 478. Because these transactions are immunized from reversal, the district court found that effective relief for the appellants is “no longer available.” Id.
After reviewing the record and the arguments before us, we find no reason to disturb the district court finding; consequently, except to the extent specifically mentioned in this opinion, appellants’ claims in the appeal before us (e.g., the allegation that the release provisions amount to a third party discharge, in violation of Code § 524(e)) are moot. We agree with the district judge that, to the extent reversal of the confirmation order would require the invalidation of good faith transfers, appellants’ unsuccessful effort to obtain a stay was fatal. It is equally evident, however, that failure to secure a stay is not ;per se dispositive of all the issues before us. It has never been the case under either Rule 805 (or under Fed.R.App.P. 8, from which it was adapted) that a party must secure a stay pending appeal. See generally 9 J. Moore & B. Ward, Moore's Federal Practice ¶ 208.3 (2d ed. 1985 Supp.). It therefore becomes necessary to look at AOY’s second defense to see if, in light of the good faith transfers, it is still possible to grant effective relief.
Where a stay has not been secured, alleged claims of mootness on issues not directly controlled by the Bankruptcy Rules are subject to the principles first enunciated in Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895):
[Wjhen, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal.
Recently this court has had occasion to consider the two-fold nature of the mootness doctrine. Along with its constitutional aspects, i.e., when the absence of a “case or controversy” deprives an article III court of jurisdiction, there exists what we have called “a melange of doctrines relating to the court’s discretion in matters of remedy and judicial administration.” Chamber of Commerce v. United States Department of Energy, 627 F.2d 289, 291 (D.C.Cir.1980). Even when the moving party is not entitled to dismissal on article III grounds, common sense or equitable considerations may justify a decision not to decide a case on the merits. See, e.g., Community for Creative Non-Violence v. Hess, 745 F.2d 697, 700 (D.C.Cir.1984); see generally 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533 (2d ed. 1984). Determinations of mootness in this latter sense cannot be cabined by inflexible, formalistic rules, but instead require a case-by-case judgment re *1148 garding the feasibility or futility of effective relief should a litigant prevail.
Although this circuit has not considered the issue directly, a line of Ninth Circuit decisions has applied these principles to disputes over the continued viability of bankruptcy appeals. Indeed, each of the parties before us invokes at least one of these cases in support of its position. We think that properly understood, the Ninth Circuit’s decisions provide the appropriate analytic framework for the mootness issue.
Appellants rely on In re Combined Metals Reduction Co., 557 F.2d 179 (9th Cir.1977), which involved ten separate appeals from a confirmation order of a Chapter X reorganization plan, and from various court orders for asset liquidation. The court held that failure to obtain a stay rendered appeals of the property sales moot. Id. at 188-89. But as to the order of confirmation:
[although the appellant did not obtain a stay of that order, this issue differs from the other appeals covered by the trustee’s motion to dismiss. If we were to conclude that the appellant is correct, and that the plan was erroneously confirmed by the district judge, then a decision to that effect could have some effect on the proceedings below. While much of the debtor’s property has been liquidated, and many of the creditors have been paid, the plan still controls the actions of the trustee_ As a result, we are of the opinion that the appeal of the order of confirmation is not moot....
Id. at 194-95 (emphasis added).
AOV distinguishes its motion to dismiss by noting not just the substantial consummation, but also the comprehensive change of circumstances brought about by the transfers. Debtor relies on, and the district court cited with approval, In re Roberts Farms, 652 F.2d 793 (9th Cir.1981). In dismissing an appeal from a confirmation order as moot, the Roberts Farms court factually distinguished Combined Metals, finding that “[i]n this case the property transactions do not stand independently and apart from the plan.” The court held that the “intricate and involved” reorganization plan under review was so fully implemented that reversal “would knock the props out from under the authorization for every transaction that has taken place [and] would do nothing other than create an unmanageable, uncontrolled situation for the Bankruptcy Court.” Id. at 797.
The implication drawn by both AOV and the district court from this holding is that “substantial consummation” within the meaning of Code § 1101(2) insulates a reorganization plan from further appeal. Consistent with this interpretation, the district court heard testimony on the “complex series of interrelated transactions” carried out pursuant to the AOV Plan, and concluded that “the Plan has been so far consummated that, as a practical matter, effective relief is impossible.” 43 B.R. at 478.
We find, however, that this is an overly broad reading of the Roberts Farms holding, and thus decline AOV’s invitation to adopt such an expansive rule. Roberts Farms does not stand for a bright-line rule that “substantial consummation” forecloses any possibility of relief from court- and creditor-approved reorganization plans. The opinion leaves undisturbed the notion that some claims may not be inescapably bound to the degree of implementation. This is the clear import of the Roberts Farms court’s rhetorical question: “Are we not quite patently faced with a situation where the plan of arrangement has been so far implemented that it is impossible to fashion effective relief for all concerned?” 652 F.2d at 797 (emphasis added). In exercising its discretionary power to dismiss an appeal on mootness grounds, a court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole. “Substantial consummation” is not a blanket discharge of this judicial duty to examine carefully each request for relief.
This more narrow reading of Roberts Farms is borne out by the Ninth Circuit’s *1149 later decision in In re International Environmental Dynamics, 718 F.2d 822 (9th Cir.1983). Robin, a creditor, sought to have certain legal fees returned to the debtor’s estate. The money had been paid out of a letter of credit earmarked for satisfaction of the bankrupt company’s debts. The recipient of the fees argued that the challenge was moot under Roberts Farms because the funds had been disbursed and the creditor had failed to secure a stay. The court responded:
Neither of these grounds for our holding in Roberts Farms compels a finding of mootness in this case. Because [the attorney] is a party to this appeal, this court could fashion effective relief by remanding with instructions to the bankruptcy court to order the return of erroneously disbursed funds. Nor would it be inequitable to hear the merits of Robin’s appeal. [The attorney] has known since 1981 that Robin contests the bankruptcy court’s order that he be paid from the certificate of deposit. We therefore conclude that this case is not moot....
Id. at 326 (citations omitted).
The implications of these cases for the appeal under consideration are evident. To be sure, the record may support the Disbursing Agent’s statement that “the entire Plan has been implemented.” But implementation is not always synonymous with consummation. At the time of the remand hearings, only $643,000 of the $3 million made available by the Steag and Sleigh letter of credit had been drawn down, and none of AOV’s $800,000 contribution had been distributed. A second-round distribution of approximately $250,-000 was made, but this still leaves over $2 million in the Steag and Sleigh fund for satisfaction of Class 5 unsecured creditors, including Hawley. More importantly, by its terms the letter of credit remains available for the compensation of any releasing creditor for three years after consummation. Combined Metals, supra, is thus directly on point: as long as the Plan controls the future actions of the Disbursing Agent, it is impossible to conclude that no effective relief is available to Hawley. As an alternative to total Plan reversal, appellant seeks court-ordered access to its pro rata share of this Fund without having to release its direct claims against Steag.
Similarly, the pending challenge to the fees awarded to White & Case are still capable of resolution, regardless of the degree of consummation. Were this court to rule favorably on Bruce’s conflict of interest allegations, see Part IV infra, one possible remedy would be to order the law firm to make partial or total restitution of these payments to the Debtor’s estate for redistribution to the creditors. As in the Ninth Circuit cases, debtor counsel was on notice of these challenges throughout the proceedings, Environmental Dynamics, supra; in fact, the final payment by AOV was made contingent on the outcome of this appeal.
While our decision to reach the merits of these two claims runs contrary to the district court judgment, we emphasize the limits of our determination. All of the parties that could be affected by these claims were before this court — the judgment will not implicate or have an adverse effect on the interests of other, non-party creditors, and our resolution of Hawley’s claims and the conflict-of-interest issue will not affect the re-emergence of the debtor as a revitalized corporate entity. We also remain mindful of the finding of substantial consummation below and, guided by that decision, will not allow a piecemeal dismantling of the Reorganization Plan in subsequent appeals of individual transactions. Based on the overwhelming creditor endorsement of the Plan, the multiple judgments below finding that the Code prerequisites for confirmation were met, the actions of the Disbursing Agent to implement the Plan, and the passage of time, a strong presumption of mootness should attach to future challenges, just as we find that it controls many of the issues now before us. The virtues of finality in the current and future proceedings are clear, and except as noted below with respect to the conflict question *1150 and Hawley’s claims, appellants’ claims are dismissed as moot.
IV. Hawley’s Claims
Hawley’s Chapter 11 claims arise in large part from the novel provisions of AOV’s Reorganization Plan. Of the eight groups into which creditors and shareholders were divided, all general unsecured creditors were placed in Class 5. The Plan provided for two sources of distribution to Class 5 creditors: $800,000 in AOV assets to compensate creditors for approximately 4% of their total claims, and a $3 million fund in the form of letters of credit established by Steag and Sleigh, which would satisfy an additional 13% of the unsecured debt. Pursuant to the release provisions, however, each class 5 creditor had to release all its claims against Steag and Sleigh before it was entitled to its share of the $3 million fund.
Code § 1129 lists twelve prerequisites to the confirmation of a chapter 11 plan. The first of these is that “[t]he plan complies with the applicable provisions of this chapter.” 11 U.S.C. § 1129(a)(1) (1982). Haw-ley’s challenges to the Plan correspond to the circumstances envisioned by the drafters of this section: “Paragraph (1) requires that the plan comply with the applicable provisions of Chapter 11, such as section[s] 1122 and 1123, governing classification and contents of plan.” H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977), S.Rep. No. 989, 95th Cong., 2d Sess. 126 (1978), U.S.Code & Admin.News 1978, pp. 5787, 5912, 6368; see also 5 Collier on Bankruptcy ¶ 1129.-02[1]. Hawley’s objections focus on these two sections: first, appellant says that by requiring it to give up a separate, more valuable claim against Steag, one that the other creditors did not have, the Plan constitutes an impermissible classification of dissimilar claims in violation of 11 U.S.C. § 1122(a); and second, that having been classified with all other unsecured creditors, Hawley was the victim of unequal treatment among class members, which is prohibited by 11 U.S.C. § 1123(a)(4).
A. Classification
Under 11 U.S.C. § 1122(a), “a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.” Hawley argues that its claim, although unsecured like all the others in Class 5, is unique because of Steag’s alleged guarantee of AOV’s $1.5 million debt to Hawley. Appellant says that this makes its claim substantially different from those of unsecured creditors who do not have third-party guarantees, and that this distinction mandates separate classification under the Plan. Great weight is attached to this circuit’s ruling in Barnes v. Whelan, 689 F.2d 193 (D.C.Cir.1982), a Chapter 13 case which, in reversing both the bankruptcy and district courts in part, approved in principle the classification of co-signed unsecured debts separately from those without co-debtors.
The district court quite properly rejected this argument, recognizing that even Barnes acknowledges that the Code’s rule on classification is permissive rather than mandatory. The Barnes court said that
Section 1122(a) specifies that only claims which are “substantially similar” may be placed in the same class. It does not require that similar claims must be grouped together, but merely that any group created must be homogeneous.
Id. at 201 (emphasis added). So it is not enough for Hawley to show that there are similar claimants in different classes; it must also show that those in its class have disparate claims.
Some of the rules about classification have changed as a result of various statutory changes, but the basic principles have remained the same. Foremost among them is the notion that the focus of the classification is the legal character of the claim as it relates to the assets of the debtor. J.P. Morgan & Co. v. Missouri Pacific Railroad, 85 F.2d 351, 352 (8th Cir.), cert. denied, 299 U.S. 604, 57 S.Ct. 230, 81 L.Ed. 445 (1936). “It is the ‘nature’ of their claims being classified that is significant, not the nature of other claims or *1151 interests a creditor might have.” In re Martin’s Point Limited Partnership, 12 B.R. 721, 727 (Bankr.N.D.Ga.1981). The existence of a third-party guarantor does not change the nature of a claim vis-a-vis the bankrupt estate and, therefore, is irrelevant to a determination of whether claims are “substantially similar” for classification purposes. See In re McKenzie, 4 B.R. 88, 91-92 (Bankr.W.D.N.Y.1980).
We also note in passing that, while there is no restriction on the total number of classifications, logistics and fairness dictate consolidation rather than proliferation of classes, so long as they are internally homogeneous. Scherk v. Newton, 152 F.2d 747, 751 (10th Cir.1945) (“All creditors of equal rank with claims against the same property should be placed in the same class.” (footnote omitted)). Although, as discussed below, we question the district court’s factual finding regarding the number of creditors who held Steag guarantees, we fully agree that in appropriate cases a plan may classify all unsecured creditors in a single class. Accordingly, Hawley’s classification was proper within the meaning of § 1122(a).
B. Unequal Treatment
Once a plan has classified creditors, it must “provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.” 11 U.S.C. § 1123(a)(4) (1982); see also In re B & W Enterprises, 19 B.R. 421, 425 (Bankr.D.Idaho 1982) (equal treatment of class members basic premise of bankruptcy law). Hawley asserts that the Plan violated this principle. While other Class 5 members received their pro rata distributions from the Sleigh and Steag fund in exchange for release of their derivative claims, Hawley was required to release a more valuable, direct claim against the guarantors. Hawley maintains that it received a telex, sent on behalf of Steag, that guaranteed the $1.5 million debt owed by an AOV subsidiary, if Hawley would continue to make coal deliveries to the subsidiary. As further proof that it was uniquely situated, Hawley points to language in the Plan that specifically excludes it from the minimum number of releases required for establishment of the fund.
The district court rejected the claim of unequal treatment on two grounds. Like the bankruptcy court before it, the district court found equality in the option accorded each Class 5 member either to tender a release in exchange for a 13% distribution, or to retain its claims and seek more substantial recovery. 31 B.R. at 1009. We find, however, that this answer begs the question. If Hawley’s factual predicate was correct, and it had a unique, guaranteed claim against Steag, its position differed substantively from that of its co-class members.
The district court’s second response rejected Hawley’s alleged uniqueness:
The difficulty with this argument is that it is based on a factual predicate upon which Hawley chose to present no evidence below.... [EJvidence that is in the record would negate any assertion that Hawley was the only creditor to receive such a telex.... As the debtor points out, Hawley should know from its participation on the Alla-Ohio Creditors’ Committee that similar telexes were sent to a large number of the debtor’s creditors at about the same time.
Id. at 1009 (emphasis in original).
As for these factual findings, however, the record speaks otherwise. To be sure, Hawley did not present independent evidence of its guarantee. But the only testimony that was given on this issue lent credence to Hawley’s alleged direct claims and, at least to some degree, to its relative uniqueness. Philip Stansbury, chairman of the Alla-Ohio Creditors’ Committee, testified at the bankruptcy court confirmation hearing that claims were brought by “one or more of U.S. Steel, Hawley or Ambrose [Coal Co.] against Sleigh as well as Steag. ... These telex claims were based on legal theories that had nothing to do with any claim that the debtor as a debtor would be *1152 able to make against Sleigh.” Tr. at 137-38 (June 28, 1983) (emphasis added). Even more to the point, William Perlstein, then counsel to the Alla-Ohio Creditors’ Committee and now Disbursing Agent, testified before the district judge at the certification hearing: “Hawley Fuel ... has its own particular dispute with Steag Handel ... the court should be aware that Hawley also has an interest that is different than the interest of the other creditors. ” Tr. at 33 (July 5, 1983) (emphasis added).
Even though neither the Code nor the legislative history precisely defines the standards of equal treatment, the most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members. The other side of the coin of unequal payment, however, has to be unequal consideration tendered for equal payment. It is disparate treatment when members of a common class are required to tender more valuable consideration — be it their claim against specific property of the debtor or some other cognizable chose in action — in exchange for the same percentage of recovery. We are not prepared to make a finding that Haw-ley in fact had a guarantee from Steag; indeed, the litigation in the New York district court leads to a contrary conclusion. However, to the extent that the creditor was called upon to release a unique, direct claim in order to participate in the $3 million Fund, we conclude that Hawley was being subjected to unequal treatment in violation of 11 U.S.C. § 1123(a)(4).
The strongest evidence for this conclusion comes from the Debtor’s Disclosure Statement. Throughout this litigation, AOV has maintained that the blanket releases called for by the Plan were a critical part of the settlement reached with Sleigh and Steag, a necessary quid pro quo for the large contribution Sleigh and Steag were making to the Reorganization Plan. Yet the Disclosure Statement specifically distinguishes between release of derivative and release of direct claims.
The basis of the derivative claims is the $25 million lawsuit brought against Steag by AOV and intervenors, the Alla-Ohio Creditors’ Committee. The suit alleged that an agency or joint-venture relationship existed between AOV and Steag, and plaintiffs sought the nullification of transfers to Steag as well as contract and tort damages. Paragraph 7(a)(1) of the Disclosure Statement explained the settlement as follows:
After extensive negotiations with Steag Handel, in consideration of the contributions made by Steag Handel to the Plan and in view of the considerable cost and time that would be spent in pursuing the litigation, as well as the uncertainty as to its outcome, the Debtors have decided to release the claims asserted in the lawsuit in exchange for Steag Handel’s contribution to the Plan. In order to effectuate a complete settlement, Sleigh and Steag Handel require releases of these claims by all the individual creditors as well.
Disclosure Statement at 39-40. As two courts below agreed, this provision on its face was entirely reasonable. Sleigh and Steag could not have been expected to commit millions of dollars to a reorganization plan and still remain liable to individual creditors for the full amount of their claims.
As for the separate liability that Steag incurred by allegedly guaranteeing particular AOV debts, however, the Disclosure Statement makes entirely different provisions. As noted above, supra pages 1151-1152, there was testimony that in addition to Hawley, both U.S. Steel and Ambrose Branch Coal Company received telexes that guaranteed the debt. The Disclosure Statement provided:
Sleigh and Steag have settled lawsuits with these parties for additional consideration. Those lawsuits involved (i) allegations that Sleigh and/or Steag Handel had more commitments directly to those particular parties ...
Disclosure Statement at 42 (emphasis added).
References to releases in the Amended Plan lack the specificity found in the Dis *1153 closure Statement. The only indication of their scope is found on the ballot form, which provided for release of “any and all claims, demands, judgments, actions and causes of action whatsoever of any and every kind and description.” The discrepancy between the two documents is not per se fatal to the release as drafted. What little guidance is offered by the case law indicates that where a conflict exists with the disclosure statement, the language of the plan should control. See In re Sonoma V, 34 B.R. 758, 761 (Bankr. 9th Cir.1983). What is decisive, however, is the acknowl-edgement in the Disclosure Statement that, quite apart from the Plan, the funders settled direct claims for additional consideration. As matters now stand, Hawley is expected to surrender these claims in return only for the same consideration tendered for release of derivative claims. Therein lies the inequality of treatment.
Additional questions regarding the motives of the Plan drafters also weigh in Hawley’s favor. While we have concluded that a unitary classification was permissible, we cannot overlook the testimonial and documentary evidence that there were only a few recipients of guarantees, and that they were easily segregable. The Plan, after failing to place appellant in a separate category, as it might have under § 1122(a), then specifically excluded Haw-ley from the general requirement that all class 5 creditors tender a release; this obviously prevented appellant from blocking the availability of the $3 million fund. Based on all the record evidence, we find it appropriate to modify the Plan to provide for greater equality of treatment.
Two features of the Plan’s provisions for Class 5 creditors enable us to grant Haw-ley relief without affecting the reorganization itself. First, the letters of credit provide sufficient funds to pay all releasing unsecured claims; any funds not drawn down by the Disbursing Agent will revert to the funders. Second, as noted supra, three years were allotted for the distribution of these funds, so they are still available to appellant and others who have not yet made a final determination whether to tender their release.
Pursuant to Article XVI of the Amended Plan, which authorizes post-confirmation modification “so long as it does not materially or adversely affect the interests of creditors ... [to] reconcile any inconsistencies in the Plan, Disclosure Statement, or the Confirmation,” we hold that in order to draw its pro rata share from the Sleigh and Steag Fund, Hawley must tender a release of any and all claims arising from the litigation between AOV and Steag as outlined in the Disclosure Statement provisions Paragraph 7(a)(1). Claims arising from direct guarantees, however, need not be released.
Our conclusion is not changed by the course of the New York litigation between Hawley and Steag. In its brief, Hawley asked this court to take notice of the favorable jury verdict in its litigation on the disputed guarantee in the New York district court. Since then, however, the trial judge has entered a J.N.O.V. order, finding that Hawley had not established the existence of an enforceable contract. Hawley Fuel Coalmart v. Steag Handel GmbH, 614 F.Supp. 361 (S.D.N.Y.1985). The holding for Steag does not affect the propriety of the Plan’s treatment of appellant, any more than the verdict favorable to Hawley would have. The current case is not concerned with the merits of the underlying claims; the focus is on whether the Plan as devised treats some creditors unfairly. Although this might be a different case if Hawley’s direct claim were patently frivolous, here appellant is just asking to be treated like any other class 5 creditor. If Hawley had decided not to press his appeal in the Second Circuit, he would be able to waive all of his claims and receive his 13% share. If appellant is successful in his suit against Steag, however, it still may not be required to forfeit its unique claim in order to share the benefits with its class. (If Hawley eventually prevails in that litigation, it would of course be required to set off this recovery against its indirect claims; appellant would not be entitled to double recovery.) The strength or weakness of *1154 the guarantee claim does not validate the unfair and illegal dilemma forced on Haw-ley by operation of the Plan.
The dissent suggests that our decision as to Hawley is both unsupported by the case law and contrary to sound public policy. Dissenting Op. at 1156. It notes that there is no authority for finding a violation of the rule of equal treatment when a creditor is required to give up more valuable consideration than other members of its class. It suggests that such a rule may work mischief by increasing the complexity of these cases and by diminishing the equality of distribution. Id.
We believe, however, that the dissent’s position would cause as much mischief as it seeks to prevent. It would be curious to find a plan unacceptable when it provides for different levels of distribution to class members, but acceptable when it provides for similarly unequal treatment by a different route: equal levels of distribution in exchange for different levels of consideration. Under either route the creditor receives less than he is entitled to from the estate, making the debtor or other creditors relatively better off. If the distribution level were the sole measure of equal treatment, shrewd debtors would be able to mistreat some creditors without running afoul of Code § 1123(a)(4).
We do not create a sweeping new rule in this case. We do not hold that all class members must be treated precisely the same in all respects. Nothing in this opinion restricts the bankruptcy court’s broad discretion to approve classification and distribution plans, even though some class members may have disputed claims, or a stronger defense than others. We simply find that on these facts, it is unfair to require a creditor to pay a higher price for the same benefit.
V. Conflict of Interest
Finally, we briefly address the question of the alleged conflict of interest. This issue arises in two contexts: first, satisfaction of the good faith requirement of 11 U.S.C. § 1129(a)(3), which is a prereq-uisite to confirmation of the plan. Second, the issue is relevant to the award of fees to White & Case for their representation of the debtor.
Bruce says that the law firm’s previous representation of the creditor Sleigh, and Sleigh’s guarantee to pay W & C’s fees should have barred the law firm from representing AOV. The district court rejected this argument, citing Code § 327(c), which says that a person is not disqualified from being employed by the debtor solely because he represented a creditor, unless there is an actual conflict of interest. The district judge also held that White & Case’s disclosure of its arrangement, including notice of its fee guarantee, removed any possible taint. 31 B.R. at 1012; cf. Hunter Savings Association v. Baggott Law Office Co., 34 B.R. 368 (S.D.Ohio 1983) (discussing duty to disclose).
With respect to confirmation of the Plan, Bruce’s challenge is moot, for the reasons discussed in Part III, supra. The Plan has been substantially consummated, so that even if we were to find a conflict, we could not reverse the Plan. See In re Cantwell, 639 F.2d 1050, 1053-54 (3d Cir.1981) (appeal of refusal to stay bankruptcy proceedings mooted by discharged debt because court could not affect result).
As for the attorneys’ fees question per se, we note that the issue has been argued separately before this court. In re AOV, No. 84-5766 (argued Apr. 10, 1986). Without expressing any opinion on the merits of his claim, we find that Bruce’s challenge to White & Case’s fee award is best left for resolution in that appeal.
Conclusion
Our decision today is relatively narrow. We hold that the bankruptcy court had jurisdiction over this case, and that the district court applied a sufficient level of scrutiny on review. We reverse the finding that Hawley was treated fairly, but dismiss the rest of the claims as moot. The question of the alleged conflict of interest *1155 as it affects the attorneys’ fee awards is reserved for a later decision.

It is so ordered.