**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: MCLEAN SQUARE ASSOCIATES,
G.P.,
Debtor.

LENNAR METRO D. C. PARTNERS,
LIMITED PARTNERSHIP,
Plaintiff-Appellant,

No. 95-3161

and

J. W. FORTUNE, INCORPORATED,
Plaintiff,

v.

MCLEAN SQUARE ASSOCIATES, G.P.,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-95-1453-A, BK-93-14161)

Argued: November 1, 1996

Decided: February 24, 1997

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William James Perlstein, WILMER, CUTLER & PICK-ERING, Washington, D.C., for Appellant. Ann Elizabeth Schmitt, REED, SMITH, SHAW & MCCLAY, Washington, D.C., for Appellee. **ON BRIEF:** Lewis S. Goodman, Mark T. Womack, SHAW, PITTMAN, POTTS & TROWBRIDGE, Washington, D.C., for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Lennar Metro D.C. Partners, L.P. (Lennar) appeals from the district court's dismissal of its appeal of a bankruptcy court order confirming the plan of reorganization of McLean Square Associates, G.P. (McLean). Lennar argues that the district court erred by holding that its appeal was equitably moot. We disagree with Lennar for the reasons stated below and affirm the district court.

I.

McLean, a general partnership, is the appellee in this case and the debtor in the underlying Chapter 11 bankruptcy reorganization. In 1987 McLean bought a parcel of commercial real estate known as the McLean Shopping Center. It financed the purchase with a $5 million capital contribution by the general partners and a $5 million nonrecourse loan from the National Bank of Washington. In 1988 the bank loaned McLean an additional $2 million and took a new note for $7 million (the Note). McLean used the additional money to buy another property in the shopping center. The interest rate on the Note was the floating prime rate published in the Wall Street Journal. The FDIC took over the National Bank of Washington in August 1990. McLean

2

continued to make monthly payments on the Note, but after McLean did not make the balloon payment due at the end of 1992 when the Note matured, the FDIC notified McLean that it was going to sell the Note.

In October 1993 McLean filed a voluntary petition for Chapter 11 reorganization in the Eastern District of Virginia. Appellant Lennar bought the Note from the FDIC in December 1993 as part of a bulk purchase of loans. McLean has continued to make the interest payments since then, but it has not made payments on the principal amount.

McLean and Lennar both submitted plans for McLean's reorganization to the bankruptcy court. The cornerstone tenant of the redevelopment proposed in McLean's plan was a food store called Sutton Place Gourmet. McLean's lease agreement with Sutton Place required McLean to make extensive renovations to the shopping center. The agreement also gave Sutton Place the right to terminate the lease if the bankruptcy court did not confirm McLean's plan by June 15, 1995, or if construction was not under way by October 1995.

The bankruptcy court heard experts from both McLean and Lennar testify as to the current value of the shopping center, its projected value after redevelopment, the costs and amount of cash needed for redevelopment, and the rate of interest that would accurately account for the risk of default on the Note. Lennar's expert suggested that the interest rate on the Note be increased to floating prime plus 2.5% to reflect what he considered to be the undersecured nature of the loan. At the date of the confirmation hearing this rate was 11.5%. McLean's expert testified that the appropriate rate of interest for a loan of similar risk would be 175 basis points over a fixed rate equal to the six and one-half year U.S. Treasury bill rate. At the date of the confirmation hearing that rate was about 6.50%, so McLean's proposed rate was a fixed 8.25%. Both experts testified as to the projected cash flow of the shopping center and McLean's likely ability to make the interest payments. Lennar also asserted a claim for $357,517 in late charges.

The bankruptcy court confirmed McLean's plan at the hearing on May 22, 1995, and entered a written order on July 17, 1995. The court

3

made three modifications to the plan that are relevant to this appeal. First, it modified the Note. It set the interest rate at floating prime (9% at that time), which was the original rate on the Note. This rate fell between the fixed 8.25% requested by McLean and the floating prime plus 2.5% requested by Lennar. The court also extended the term of the Note through the end of 2001 with principal payments starting in 1999 and a balloon payment at the end. Second, the court disallowed Lennar's claim for late charges on the ground that Lennar suffered no damage as a result of the delay. Third, because the plan projected an operating deficit of $122,352, the court conditioned the plan by requiring McLean's general partners to post a letter of credit for $200,000 to ensure that adequate cash was on hand to finish the redevelopment once it began.

Lennar did not seek a stay of the confirmation order because it feared that Sutton Place might terminate the lease if the redevelopment did not begin on time. Lennar nevertheless appealed the confirmation order to the district court in October 1995. Lennar objected to the confirmation order on the following grounds: (1) the late charges should have been included, (2) the plan left Lennar undersecured, (3) the interest rate was too low, and (4) the plan was not feasible. Lennar asked the district court to reverse the bankruptcy court and enter an order denying confirmation of the plan.

The district court did not reach the merits of these objections. On November 6, 1995, McLean filed a motion asking that the court dismiss Lennar's objections as moot. McLean argued that there was no practical way for a court to grant the relief requested because the plan was substantially consummated, major construction had begun, and third parties had relied on the plan and entered into contracts with McLean (the debtor). McLean provided an affidavit from one of its general partners describing the various contracts entered into and describing the construction work that was already under way.

Lennar responded by asking for less relief. In its response it asked that the district court order the bankruptcy court to modify the plan so that McLean would pay the late charges and a market rate of interest. Lennar described these two elements as the"key portions" of its appeal. Lennar argued that no third parties would be adversely affected by the more limited relief and that the additional interest

4

would not jeopardize the plan because McLean's partners (as general partners) were obligated to make additional capital contributions to cover any shortfalls.

The district court held a hearing on Lennar's appeal on December 1, 1995. At the hearing Lennar again asked for the limited relief of late charges and a market rate of interest. McLean pointed out that if the court granted the relief requested, the plan would have a real cash flow problem, with a projected operating deficit (using Lennar's numbers) of $336,750 in 1996 and $132,028 in 1997. The district court sided with McLean and granted its motion to dismiss under the doctrine of "equitable mootness." It found that "to allow these appeals to be heard would effectively run significant risks to seriously affecting third parties in that there are other tenants, other businesses planning to do business there, and that would not be fair to them." The court also noted that Lennar had declined to seek a stay even though it could have, that the plan had been substantially consummated, and that there had been "reasonable reliance upon the finality of the Bankruptcy Court's decision [confirming the plan]." Lennar appeals the decision of the district court.

II.

We turn to the only question before us -- whether the district court erred in dismissing Lennar's appeal on the ground of "equitable mootness."

The equitable mootness doctrine allows a reviewing court, in certain circumstances, to refrain from reviewing the merits of a bankruptcy court order. The doctrine applies to cases where the court finds that it should not grant relief on equitable and prudential grounds even if the party seeking relief might win on the merits.

This circuit previously applied the equitable mootness doctrine in Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 841 F.2d 92 (4th Cir. 1988). In Central States, we stated the test for applying the doctrine as follows:

> [D]ismissal of the appeal on mootness grounds is required when implementation of the plan has created, extinguished

5

or modified rights, particularly of persons not before the court, to such an extent that effective judicial relief is no longer practically available. The court should reach a determination upon close consideration of the relief sought in light of the facts of the particular case.

Id. at 96 (citations omitted).*

Lennar argues on appeal that the district court misapplied the Central States test because the relief sought would not affect the rights of third parties. As mentioned above, in district court Lennar requested an order increasing the interest rate on the Note and adding late charges. Lennar argues that these changes could be made to the plan without substantially affecting the rights of third parties.

We disagree. The relief Lennar requests would adversely affect the cash flow and financial stability of the shopping center. The bankruptcy court heard expert testimony that McLean could not make the payments that Lennar requested:

_____

*In fashioning a test for equitable mootness, other circuits have considered additional factors including (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the success of the plan, and (4) the public policy of affording finality to bankruptcy judgments. See, e.g., In re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996) (en banc); Manges v. Seattle-First Nat'l Bank (In re Manges), 29 F.3d 1034, 1038-39 (5th Cir. 1994); In re UNR Indus., 20 F.3d 766, 769 (7th Cir. 1994); In re Chateaugay Corp., 988 F.2d 322, 325 (2d Cir. 1993); Rochman v. Northeast Utils. Serv. Group (In re Public Serv. Co. of N.H.), 963 F.2d 469, 471-72 (1st Cir. 1992); First Union Real Estate Equity and Mortgage Inv. v. Club Assoc. (In re Club Assoc.), 956 F.2d 1065, 1069 (11th Cir. 1992); In re AOV Indus. , 792 F.2d 1140, 1147 (D.C. Cir. 1986); Trone v. Roberts Farms, Inc. (In re Roberts Farms Inc.), 652 F.2d 793, 796-97 (9th Cir. 1981). Lennar argues that Central States, which places primary focus on how the relief requested would affect third parties, is the proper test. We note that applying the other factors listed above would not help Lennar, so we need not decide which other factors may apply in this circuit.

6

> Q. In your opinion, . . . if the rate of prime plus 2 1/2% is incorporated into the Debtor's plan, what would be the effect on the feasibility of the plan?
>
> A. I believe there is not sufficient cash flow to make the payments called for in the plan.

Transcript of May 22, 1995 hearing at 94. If the plan was modified by increasing the interest rate on the loan to prime plus 2.5% and by reinstating the late charges, McLean would likely suffer significant operating deficits. This could then upset the interests of the tenants and other third parties who have relied on the confirmed plan with the cash flow projections in that plan.

The record contains evidence indicating third party reliance. In its brief to the district court McLean attached an affidavit of one of the shopping center managers who described some of the commitments made to and by third parties after confirmation. For example, Sutton Place Gourmet paid $49,938 on behalf of McLean as partial commission due to a broker under the lease agreement. Sutton Place made this payment and proceeded to satisfy its obligations under the lease on the assumption that the plan had the unconditional approval of the bankruptcy court and would be implemented as approved. McLean entered into contracts with a construction company (Jack Bays, Inc.) and other contractors who began demolition and redevelopment of the center in September 1995. As of October 31, 1995, McLean had just $90,000 cash left on hand. Increasing the interest rate on the Note and adding late charges would upset the carefully crafted plan and would increase the risk that third parties would not be paid or would lose monies already expended.

Lennar counters this reasoning by noting that the plan already provides for an operating deficit. An operating deficit in a general partnership can require a new capital contribution by the partners. But the bankruptcy court, aware that the plan projected an operating deficit of $122,352, required that the McLean general partners post a $200,000 letter of credit to provide for this shortfall. Thus, in the bankruptcy court's judgment, the implied obligation of the general partners was not enough, and it required the letter of credit to ensure that redevelopment would be completed. The bankruptcy court con-

7

firmed the plan in part on the finding that McLean "will have sufficient cash with which to complete the proposed redevelopment." Increasing the interest payments and imposing late charges would increase the projected operating deficit over the $200,000 secured by the letter of credit. This would mean that capital contributions beyond those provided for (and guaranteed) would likely be required.

We realize, as Lennar stresses, that general partners in a partnership do have a legal obligation to make any necessary capital contribution. But the ability of third parties to get paid if contributions were called for would turn on the wherewithal of the general partners. The third parties here entered into their contracts with McLean on the reasonable assurance that the cash projected in the plan would be available. The letter of credit posted by the partners played a significant role in the bankruptcy court's decision to confirm:

> Based on the estimates of cost . . . and the revenue sources available to the Debtor, specifically the cash on hand, future rental income, advances from Sutton, sale proceeds from the sale of the residential property <u>and the letter of credit from the general partners</u>, the Court finds the Plan to be feasible.

Supplemental Appendix at 50 (emphasis added). There were questions raised about the financial status of the general partners. For this reason the bankruptcy court required a letter of credit to guarantee additional capital contributions by the general partners. Increasing the interest payments to Lennar and granting it late charges would significantly increase the likelihood of calls for capital contributions that were not secured. This prospect, in turn, increases the risk to third parties that there will not be sufficient cash to complete the redevelopment. So we agree with the district court that granting the relief requested by Lennar would impair the rights of third parties who relied on the confirmed plan.

Lennar argues in the alternative that even if cash flow is a problem, the district court could have effectively fashioned relief by using a "split accrual" interest rate. Under this approach, as we understand it, the court would increase the interest rate and reinstate the late charges, but the monthly interest payments to Lennar would remain the same until the Note matures. The increased interest charges would

8

be capitalized and come due, along with the late charges, when the Note matures and the balloon payment is due. Thus, the operating cash flow of the property would not be affected. The only change (according to Lennar) would be a decrease in the projected profits of the general partners. But this relief would still impair the stability of the plan to a significant extent. Lennar's loan to McLean is a nonrecourse loan. If the value of the shopping center was to drop below the remaining liability on the loan, the general partners would have a strong financial incentive to walk away from the property, allow Lennar to foreclose, and leave third parties unpaid. By increasing the liability, this "split accrual" relief increases the risk that the general partners might default, thereby impairing the rights of third parties. We would not grant "split accrual" relief in any event because Lennar did not request this relief in its brief to the district court or at oral argument before that court.

In sum, because the relief requested by Lennar significantly affects the rights of third parties, the district court was correct in dismissing Lennar's appeal based on the equitable mootness doctrine. The order of the district court is therefore

AFFIRMED.

9