543 F.2d 1
 UNITED STATES of America, Appellee,
v.
BOARD OF EDUCATION OF the CITY OF NEW YORK et al.,
Defendants-Appellees,
and
Council of Supervisors and Administrators, Local 1, AFSA,
AFL-CIO, et al., Intervenors-Appellants,
and
Community School Board, District 26, Intervenor-Appellant.
UNITED STATES of America, Petitioner-Appellee,
v.
Solomon DEREWETSKY et al., Respondents-Appellants.
 Nos. 1409, 1410 and 1411, Dockets 76-6096, 76-6108 and 76-6110.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 19, 1976.
Decided Sept. 23, 1976.
 
 Leonard Greenwald, New York City (Frankle & Greenwald, New York City, of counsel), for intervenors-appellants Council of Supervisors and Administrators, Local 1, AFSA, AFL-CIO, et al.
 Cosmo DiTucci, Brooklyn, N. Y., for intervenors-appellants Community School Bd., District 26.
 Richard P. Caro, Brooklyn, N. Y., Asst. U. S. Atty. (David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for appellee.
 Before VAN GRAAFEILAND, Circuit Judge, and KELLEHER* and GAGLIARDI,** District Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from an order directing the completion and filing of certain Department of Health, Education and Welfare informational reports. The public school system of the City of New York is the recipient of substantial amounts of federal financial aid. As an inducement for the granting of such aid, the Board of Education agreed to comply with federal anti-discrimination statutes and regulations implementing them. In February 1976, HEW sent forms for special compliance reports to the Board of Education for distribution to all of the public schools in the City of New York except the special educational schools, with instructions that they were to be completed and returned by May 3, 1976. These forms sought a great deal of information concerning the New York City School system, including a breakdown of pupils by race and sex. Specifically, all of the pupils in the city school system were required to be statistically classified as male or female members of one of the following groups:
 
 
 2
 (1) American Indian or Alaskan native;
 
 
 3
 (2) Asian or Pacific Islander;
 
 
 4
 (3) Black, not of Hispanic origin;
 
 
 5
 (4) Hispanic;
 
 
 6
 (5) White, not of Hispanic origin.
 
 
 7
 A second form, called the EEO-5 form, was distributed in March and was to be completed and returned by May 28, 1976. This required similar classification of each school's staff and personnel.
 
 
 8
 Because of the Board of Education's failure or refusal to complete the forms as requested, the United States, on May 10, 1976, sued in the Eastern District for an injunction compelling compliance. A motion for a preliminary injunction was made before District Judge Weinstein, who granted it on May 27, 1976 with the consent of the defendant Board of Education which had already commenced compliance by distributing the forms to its employees.
 
 
 9
 The principals of the city school system were not in accord with the position taken by the Board of Education, and many of them refused to complete the forms which they received. Accordingly, by order to show cause dated June 15, 1976, the government initiated contempt proceedings against 135 principals who refused to participate in the racial survey. Following service of the order to show cause, many of the principals promptly indicated that they would comply with the court's injunction order. Of those who appeared before Judge Weinstein, all but one also agreed to comply.[1]
 
 
 10
 The Council of Supervisors and Administrators was permitted to intervene on behalf of its school principal-members on June 16, 1976; and, in his final order, which is the order on appeal, Judge Weinstein also permitted intervention by the Community School Board, District 26. This appeal has been taken by the intervening parties.
 
 
 11
 It is quite obvious from the statements made to Judge Weinstein that the principals' objection to participating in the racial survey was based largely on moral rather than legal grounds. We have included in the margin excerpts from several of these statements which are typical of the attitude disclosed.[2] The attorneys for appellants, on the other hand, attack the validity of the District Court's order on legal grounds. They contend that the principals were subjected to the order of the District Court without due process,[3] that the principals' fifth amendment rights against self-incrimination have been violated,[4] and that their right of privacy has been improperly invaded.[5]
 
 
 12
 Unfortunately, these interesting questions have been made academic for the purposes of this appeal by the fact that all of the principals, save one, have complied with or are in the process of complying with the District Court's order. We find that, as to these parties, the appeal is moot,[6] and we leave to another panel the issues which will be raised by the recalcitrant principal who has been held in contempt and who is proceeding by separate appeal.
 
 
 13
 The appeal is dismissed without cost to any of the parties.
 
 
 
 *
 Of the Central District of California, sitting by designation
 
 
 **
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 Dr. Howard L. Hurwitz, principal of Long Island City High School, felt so deeply that the racial information requested was improper that he refused to complete the forms and has been held in civil contempt of court. He is proceeding by separate appeal
 
 
 [2]
 "Very briefly, your Honor, for my Government, the Government of the United States of America to take an action which I only associate with the deepest of the enemies of my people, the Nazis, is so inconsistent toward my feeling with the Government to make real emotion. I never see a child, and I tell you the truth, as a white child, black, Puerto Rican or Oriental. I have been in this business for 27 years. I have worked in Harlem for 12 years, and Bedford Stuyvesant, and I only asked that they ask me for the name of the child. I don't think I can remember if a child is black or white. My children went to college and filled out applications, and it said on some of them "No pictures," so there was no identification as to race or religion, and I was happy to see that. I would not be a principal in New York City, were it not for the fact that religion and race were not a part of my selection. I knew no one, but for my Government to ask me to give that kind of information, I find so inconsistent with the nature of the Government in a bicentennial year, I am just appalled." (Appendix, pp. 285-6)
 "I find it extraordinarily painful to have to respond in this case, because I am, your Honor, the product of a rather large mid-European family, who about 35 years ago was forced to respond to another type of ethnic survey, and as a result, about 45 of them did not survive. Therefore, I find this a tremendous moral decision to make, because I did not believe in ethnic surveys, nor do I believe in quota systems. As a matter of fact, when I was a student at Columbia University, I was forced to fill out an application form which asked me what my religion was, because obviously Columbia had a quota system, and I see the actions of HEW as on the platform of the reformation of a quota system." (Appendix, pp. 299-300).
 "These ethnic surveys by their very nature are very destructive. They point up the differences among people, and I think we only have to look around the world at the present time to see the nature of the difference people accentuate, and the problems that are brought forth. There have been several wars in Ireland, Lebanon, treatment of expulsion from the Asians from Asia and so forth. I only have to look at my own background. I have never seen any of my four grandparents. Being Jewish, they were put to death by the Nazis. These are times of differences, your Honor. For example, these surveys. I don't see anyone here who can testify that in the long run that this material will not be used for some similar type of use. I pray that it isn't. Thank you." (Appendix, p. 308).
 
 
 [3]
 The District Court's order, tracking the language of Federal Rules of Civil Procedure, Rule 65(d), was directed to the Board of Education and its "agents, employees, subordinates, and all persons or entities in active concert or participation with them or subject to their supervision in this matter". Such orders are generally held to be binding upon employees who are not parties, because it is assumed that their rights were adequately represented by their employer who was a party. 11 Wright and Miller, Federal Practice and Procedure § 2956. In this case, the District Court, in permitting intervention by the Council of Supervisors and Administrators, made a specific finding that the interests of the school principals were not adequately represented by the existing parties
 
 
 [4]
 One of the purposes of the HEW informational forms was to investigate the possible existence of discrimination in the school system. Appellants contend that this might lead to prosecution under the New York Civil Rights Law. The order appealed from provided that any individual seeking to rely on his personal right not to incriminate himself might apply to the court for relief but held that, since no individual had as yet made such a claim, the issue was not ripe for decision
 
 
 [5]
 Appellants' right of privacy contention is based on the requirement in Form EEO-5 that the race of school personnel required to complete this form must be self-disclosed
 
 
 [6]
 The District Court's orders covered only the informational reports which were requested in February and March of 1976. We decline to speculate concerning the form and content of any reports which may be sought at some future date. Securities & Exchange Comm'n v. Medical Comm. for Human Rights, 404 U.S. 403, 406, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972)