United States Court of Appeals,

Fifth Circuit.

No. 93-7328.

In the Matter of Clinton MANGES, Debtor.

Clinton MANGES, Duval County Ranch C and Man-Gas Transmission, Appellants-Cross Appellees,

v.

SEATTLE-FIRST NATIONAL BANK and SeaFirst American Corporation, Appellees-Cross Appellants.

In the Matter of DUVAL COUNTY RANCH C, Debtor.

Clinton MANGES, Duval County Ranch C and Man-Gas Transmission, Appellants-Cross Appellees,

v.

SEATTLE-FIRST NATIONAL BANK and SeaFirst American Corporation, Appellees-Cross Appellants (Two Cases).

In the Matter of MAN-GAS TRANSMISSION, Debtor.

Aug. 29, 1994.

Appeals from the United States District Court for the Southern District of Texas.

Before KING and SMITH, Circuit Judges, and KENT[*], District Judge:

KING, Circuit Judge:

Appellants, the debtors in a consolidated bankruptcy proceeding, appeal from the district court's order affirming the bankruptcy court's confirmation of the principal creditor's proposed plan of reorganization. By way of cross-appeal, the creditors request that we dismiss the appeal as moot. On the basis of the facts before us, we agree with the creditors and, upon

_____

[*]District Judge of the Southern District of Texas, sitting by designation.

1

finding the issues presented to be moot, dismiss the appeal.

## I. Background

Appellant Duval County Ranch Company (the "Ranch Company") owned the surface estate of a 99,000-acre ranch in Duval County, Texas. Appellant Man-Gas Transmission Company ("Man-Gas") owned the mineral rights under the ranch property. Both of these companies were wholly owned by the individual debtor and appellant, Clinton Manges ("Manges").[1] The ranch was undisputedly and by far the largest asset of the Manges debtors. Seattle First National Bank ("Seattle") made a loan to the Ranch Company in 1980, which was secured by a mortgage on the ranch surface estate and personally guaranteed by Manges.

### A. The Agreed Judgment and Foreclosure

The loan went into default, and Seattle filed suit against the Ranch Company and Manges in the United States District Court for the Western District of Texas, San Antonio Division, to recover the sums owed. Eventually, in August of 1988, the parties entered into an agreed judgment pursuant to which the Ranch Company and Manges would make periodic payments on the loan.

After the Ranch Company and Manges subsequently failed to make one of the scheduled payments under the agreed judgment, the Ranch Company filed a voluntary Chapter 11 bankruptcy petition to prevent foreclosure under the agreed judgment. Soon after, Manges and Man-Gas also entered Chapter 11 proceedings.

---

[1]Collectively, we refer to these appellants as the "Manges debtors."

Seattle requested relief from stay, but agreed to abandon that request temporarily if certain conditions were met. The court signed an "Agreed Order On Motion For Relief From Stay" on September 5, 1990. Pursuant to that order, the Manges debtors were to obtain insurance coverage for improvements to the ranch within ten days of the order's entry. When the Ranch Company failed to obtain the requisite binder for coverage within the agreed time-period, Seattle gave notice of default. After the Ranch Company received the notice and failed to cure the default, the automatic stay was lifted, and the San Antonio court entered an order of sale of the ranch property on October 30, 1990. Although this order was stayed temporarily, the ranch was eventually sold at auction by federal marshals on January 16, 1991 (the "January 16 foreclosure"), and was purchased by SeaFirst American Corporation ("SeaFirst"), a wholly-owned subsidiary of Seattle. The San Antonio court confirmed the sale on January 17, 1991, and the Manges debtors appealed both the order of sale and confirmation of sale to this court.[2]

B. The Plan of Reorganization

The Manges debtors proposed several plans of reorganization, but the bankruptcy court refused to confirm any of the debtors' proposed plans. Instead, by order entered June 10, 1991, the bankruptcy court confirmed the plan proposed by Seattle and SeaFirst (the "Plan") after balloting and a four-day confirmation

_____

[2]We dismissed that appeal as moot after the bankruptcy court confirmed the creditor plan of reorganization as discussed below.

3

hearing. In connection with the confirmation order, the bankruptcy court issued findings of fact and conclusions of law, including the following: (i) that the Plan complied with all requirements of 11 U.S.C. §§ 1123 and 1129, as well as other applicable law; (ii) that the Plan "was proposed in good faith and not by any means forbidden by law"; (iii) that "[t]he principal purpose of the [ ] Plan is not the avoidance of taxes ..."; and (iv) that the debtors had "no equity in any of the property of the estates subject to the liens."[3]

Under the Plan, a liquidating trust would be created to hold legal title to the debtors' assets for sale and distribution of proceeds to the various creditors (the "Trust"). The Plan appointed a vice-president of Seattle to serve as liquidating trustee, overseeing the payment of approximately $80 million in creditors' claims with approximately $35 million in trust assets. The Manges debtors were required to execute the trust agreement creating the Trust as well as a "blanket conveyance" transferring all of their assets to the Trust. In the event the Manges debtors failed to do so, third parties were authorized to execute the appropriate documents. The Plan also provided that, upon its confirmation, the January 16 foreclosure would be rescinded and all liens existing prior to the foreclosure would be reinstated. Another important aspect of the Plan was that SeaFirst would create a $1.3 million creditor fund to pay administrative expenses,

---

[3]With respect to this finding, the bankruptcy court further decreed that "[t]he value of the secured claims shall be determined by the sales price for the collateral."

priority wage claims, and general unsecured claims. Additionally, SeaFirst voluntarily subordinated its estimated $36 million unsecured claim to those of the remaining unsecured creditors, and Seattle and SeaFirst waived their approximately $1.7 million administrative expense claims.

With respect to tax consequences, the Plan specifically provided that the Trust would be a non-taxable grantor trust—i.e., that the Trust would not be liable for any taxes resulting from the sale of property. The Plan included an express provision that the trustee was under no duty to file federal tax returns or to pay income taxes of any kind. Nor was the trustee obligated to make available trust assets or sale proceeds to satisfy the tax claims. The IRS, one of the Manges' creditors, at first lodged objections, but, during the confirmation hearings, withdrew any objections it had to the Plan. Interestingly, the bankruptcy court, in its June 10 findings and conclusions, specifically found that "[t]here should not be any significant post-confirmation income tax liability to Manges due to the availability of tax attributes, the value of the collateral, the availability of subchapter S termination,[4] and the lack of personal liability to Manges for [the Ranch Company's] taxes."[5]

_____

[4]Although Man-Gas was created as a subchapter S corporation, and consequently tax liabilities could be funnelled through to its owner, Manges, the bankruptcy court deferred entry of its written confirmation order so that Manges could convert Man-Gas to a subchapter C corporation, thus immunizing him from personal liability.

[5]The bankruptcy court further observed that "[e]ven in the event that the debtors are faced with post-confirmation tax

C. The Appellate Efforts

The Manges debtors took an appeal from the confirmation order to the district court and unsuccessfully applied for a stay of the Plan pending appeal from both the bankruptcy court and the district court.  They also sought a writ of mandamus from this court to compel the district court to issue the stay, but that request was similarly denied.  Seattle and SeaFirst urged the district court to dismiss the appeal as moot, but the district court refused, concluding that the Plan had not been substantially consummated.  Specifically, the court below found that the most substantial asset of the debtors—the ranch property—had not been sold, though it recognized that a substantial amount of the Trust property had otherwise been alienated.  Reaching the merits, the district court affirmed the confirmation order by order entered May 4, 1993 (the "May 4 order").

The Manges debtors then commenced the instant appeal.  Two days after filing their notice of appeal, on May 14, 1993, the Manges debtors sought and were denied an emergency stay from the district court of its May 4 order pending appeal to this court.  This court denied a similar motion for stay on May 25, 1993.  On September 7, 1993, the Manges debtors filed an amended motion to stay the Plan pending appeal, but that motion was also denied a week later.

D. The Administration of the Trust

---

liability, the [ ] Plan is not unfair or inequitable since the debtors have had the benefit of the prepetition use of money and property without the burden of paying taxes."

As a consequence of the failure to obtain a stay, numerous events have taken place pursuant to the Plan. The Trust has been created, and, soon after the Plan was confirmed, SeaFirst funded the creditor fund, much of which was subsequently disbursed to administrative claimants and priority wage claimants. According to affidavits filed in the district court while the first tier of this appeal was before that court, the Trust paid over $1.5 million in creditors' claims and over $2.5 million in repairs and operating expenses relating to the ranch property. Those affidavits also reflect that the Trust litigated several unsecured claims and was poised to distribute fifty percent of the remaining monies to the allowed, general unsecured creditors by the time of the district court appeal. The Trust additionally sold working interests, executed oil and gas leases, entered into gas purchase contracts, and leased almost all of the surface area of the ranch for grazing and hunting purposes. It began reducing significant *ad valorem* tax liabilities which had not been paid for years.

Most significant, however, is the fact that the ranch property and all remaining mineral interests have been sold to non-creditor third parties as of December 16, 1993 (the "December 16 sale"), during the pendency of this appeal. Although we are not informed of what additional, administrative measures have been taken during the course of this appeal, we can only presume that the trustees have continued to implement the unstayed Plan.

## II. Analysis

The Manges debtors claim that the Plan as confirmed deprives

7

them of their ability to have a "fresh start" because they will be saddled with significant post-confirmation tax liabilities and will have no estate assets with which those liabilities can be satisfied. Seattle and SeaFirst counter that the controversy is moot because the Plan has been so substantially consummated that this court can no longer provide effective relief.

Generally, the mootness inquiry centers upon the concern that only live cases or controversies be decided by our courts. *See Powell v. McCormack,* 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 1951 n. 7, 23 L.Ed.2d 491 (1969) (recognizing that the Court's inability to consider the merits of a moot case "is a branch of the [U.S. CONST. art. III] constitutional command that the judicial power extends only to cases or controversies") (citing *Sibron v. New York,* 392 U.S. 40, 57, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968)). A controversy becomes moot in the traditional sense when, as a result of intervening circumstances, there are no longer adverse parties with sufficient interests to maintain the litigation. *Chevron U.S.A., Inc. v. Traillour Oil Co.,* 987 F.2d 1138, 1153 (5th Cir.1993). Many courts, including our own, however, have employed the concept of "mootness" to address equitable concerns unique to bankruptcy proceedings.[6] In this context, "mootness" is not an article III

---

[6]*See, e.g., In re UNR Indus., Inc.,* 20 F.3d 766, 769 (7th Cir.1994) (recognizing the virtually universal principle that "a plan of reorganization, once implemented, should be disturbed only for compelling reasons" and collecting cases); *Rochman v. Northeast Util. Serv. Group (In re Public Serv. Co.),* 963 F.2d 469, 471-72 (1st Cir.) (noting that the mootness doctrine facilitates the "important public policy favoring orderly reorganizations and settlement of debtor estates by "affording finality to the judgments of the bankruptcy court' ") (quotation

8

inquiry as to whether a live controversy is presented; rather, it is a recognition by the appellate courts that there is a point beyond which they cannot order fundamental changes in reorganization actions. *See In re AOV Indus., Inc.,* 792 F.2d 1140, 1147 (D.C.Cir.1986) (recognizing that "[e]ven when the moving party is not entitled to dismissal on article III grounds, common sense or equitable considerations may justify a decision not to decide a case on the merits") (citations omitted). Consequently, a reviewing court may decline to consider the merits of a confirmation order when there has been substantial consummation of the plan such that effective judicial relief is no longer available—even though there may still be a viable dispute between the parties on appeal. *Halliburton Serv. v. Crystal Oil Co. (In re Crystal Oil Co.),* 854 F.2d 79, 82 (5th Cir.1988); *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.),* 764 F.2d 406, 406-07 n. 1 (5th Cir.1985). The Eleventh Circuit cogently described the competing interests which must be considered in this regard:

> The test for mootness reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy order adversely affecting him.

*First Union Real Estate Equity and Mort. Inv. v. Club Assoc. (In re*

---

omitted), *cert. denied,* --- U.S. ----, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992); *Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.),* 652 F.2d 793, 798 (9th Cir.1981) (holding that reversal of the confirmation order "would knock the props out from under the authorization for every transaction that has taken place, [and] would do nothing other than create an unmanageable, uncontrollable situation for the Bankruptcy Court").

*Club Assoc.),* 956 F.2d 1065, 1069 (11th Cir.1992) (citation omitted). The concept of "mootness" from a prudential standpoint protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented. As the Seventh Circuit aptly framed the issue, we must determine "whether it is prudent to upset the plan of reorganization at this late date." *In re UNR Indus., Inc.,* 20 F.3d 766, 769 (7th Cir.1994).

This court has historically examined three factors in making this assessment—(i) whether a stay has been obtained, (ii) whether the plan has been "substantially consummated," and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan. *Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.),* 939 F.2d 289, 291 (5th Cir.1991) (citing *Crystal Oil,* 854 F.2d at 81-82; *Cleveland, Barrios, Kingsdorf & Casteix v. Thibaut,* 166 B.R. 281, 286 (E.D.La.1994).[7] We evaluate each in turn.

A. Halting the Runaway Train:  the Motions to Stay

As the Manges debtors correctly observe, in many of the cases in which bankruptcy appeals were dismissed as moot, the appellants failed to seek a stay. *E.g., Crystal Oil,* 854 F.2d at 82 (noting the objecting creditor "should have sought a stay so the reviewing court could consider the plan's propriety before implementation led

---

[7]The Eleventh Circuit, in a recent opinion on the subject, listed an additional inquiry—whether the relief sought would affect the reemergence of the debtor as a revitalized entity. *See First Union Real Estate Equity and Mort. Inv. v. Club Assoc. (In re Club Assoc.),* 956 F.2d 1065, 1069 n. 11 (11th Cir.1992).

10

third parties to make commitments in reliance on the plan");
*Cleveland, Barrios,* 166 B.R. at 286-87 (observing that the failure to seek a stay warrants dismissal of appeal on mootness grounds if the lack of stay has permitted a comprehensive change in circumstances or substantial consummation of the plan); *see also Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.),* 652 F.2d 793, 798 (9th Cir.1981) (dismissing an appeal on equitable grounds where appellant never applied to bankruptcy court for stay). By contrast, the Manges debtors argue, they diligently—albeit unsuccessfully—pursued a stay at every turn.[8] Thus, they appear to conclude, they have preserved their right to a merits review. However, in rejecting a similar argument, Judge Easterbrook aptly pointed out that the failure to seek a stay is not "a censurable event to be punished by refusal to adjudicate the merits"; rather,

> [t]he significance of an application for a stay lies in the opportunity it affords to hold things *in stasis,* to prevent reliance upon the plan of reorganization while the appeal proceeds. A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization. And it is the reliance interests engendered by the plan, coupled with the difficulty of reversing critical transactions, that counsels against attempts to unwind things on appeal. Every incremental risk of revision on appeal puts a cloud over the plan of reorganization and derivatively over the assets of the reorganized firm.

---

[8]The district court denied the debtors' request for a stay because it was not persuaded that the Manges debtors had the requisite likelihood of success on appeal. The bankruptcy court more fully elaborated its grounds for denial of stay, reasoning that, even if execution of the Plan were stayed, overwhelming circumstances would compel it to lift the automatic stay to allow foreclosure upon the estate's assets. Because foreclosure upon the debtors' assets would leave little to be divided among the remaining claimants, the bankruptcy court concluded that the most fair and equitable result was to confirm the Plan and deny the stay.

*In re UNR Industries,* 20 F.3d at 769-70; *see also In re AOV Indus., Inc.,* 792 F.2d 1140, 1147 (D.C.Cir.1986) (recognizing that unsuccessful attempt to obtain stay had same result as failure to seek stay). In short, the failure or inability to obtain a stay pending appeal carries the risk that review might be precluded on mootness grounds.

Although we recognize that, in many situations, the reviewing court's decision whether to grant a stay is essentially dispositive of the case—considering the average length of time for an appeal[9]—we note that several provisions of the Bankruptcy Code preordain such a consequence. *See, e.g.,* 11 U.S.C. § 363(m) (mandating that the reversal of an unstayed order authorizing the sale or lease of estate property "does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased such property in good faith ... unless such authorization and such sale or lease were stayed pending appeal"); 11 U.S.C. § 1127(b) (curtailing significantly bankruptcy court's ability to modify plan of reorganization after its confirmation and "substantial consummation"); *see also* Bankruptcy Rule 805 ("Unless an order approving a sale of property ... is stayed pending appeal, the sale to a good faith purchaser ... shall not be affected by the reversal or modification of such order on appeal, whether or not the purchaser knows of the pendency of the appeal."). As the Ninth

[9]*See In re UNR Industries,* 20 F.3d at 768 (noting that "[t]he long delay between the bankruptcy court's confirmation of the plan and the district court's disposition of objections to that action laid the foundation for the conclusion that the plan is beyond challenge").

12

Circuit recognized in *In re Roberts Farms,* "the principle of dismissal of an appeal for lack of equity ... places a heavy burden on aggrieved party-appellants in bankruptcy cases. It is justified to prevent frustration of orderly administration of estates under various provisions of the Bankruptcy Act." 652 F.2d at 798. It is undisputed that the Manges debtors did not obtain a stay, and we must thus examine the transactions which have taken place as a consequence to determine whether the confirmation challenge has become equitably or prudentially moot.

B. Unscrambling the Eggs:  Substantial Consummation

"Substantial consummation" is a statutory measure for determining whether a reorganization plan may be amended or modified by the bankruptcy court.  11 U.S.C. § 1127(b).[10]  This court, in addressing the mootness issue, has borrowed the "substantial consummation" yardstick because it informs our judgment as to when finality concerns and the reliance interests of

---

[10]The statutory definition of "substantial consummation" is as follows:

"[S]ubstantial consummation" means—

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan;  and

(C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).  The district court focused only upon subpart (A) of the test in denying the motion to dismiss, and the parties appear to dispute only that requirement.

13

third parties upon the plan as effectuated have become paramount to a resolution of the dispute between the parties on appeal. *E.g., Block Shim,* 939 F.2d at 291; *accord Club Associates,* 956 F.2d at 1069.

The district court concluded that the Plan had not been "substantially consummated," and, as a result, the relief sought was not moot. The principal basis for this conclusion was the fact that the ranch had yet to be sold at the time the district court entered its order. Of course, that event has now occurred, and we must determine as a threshold matter whether we may properly incorporate the December 16 sale into our mootness analysis. If so, we will then evaluate the effect the sale has upon that determination, in addition to the other transactions which are contended to evidence substantial consummation of the Plan.

### 1. Evidence of December 16 sale

The Manges debtors have long recognized the significance of this transaction and the consequent effect it would have on the mootness question. In fact, in requesting a stay during the pendency of this appeal, they represented that:

> The trustee is currently involved in negotiations to sell the property, having received written offers to purchase the property. An order preventing such sale is necessary to prevent the sale from rendering moot the appellants' appeal. ***A sale of this property would leave the bankruptcy estate with few assets and would render this appeal moot*** (emphasis added).

As noted above, this court denied the stay.

Now that the ranch has been sold and the threat of mootness looms larger, the Manges debtors challenge the December 16 sale—apparently for the first time—on the basis that there is no

14

evidence that the sale was made to a good-faith third-party purchaser, a requirement that they contend has been incorporated into the first prong of the substantial consummation determination. They also speculate that "discovery *could conceivably reveal* ... that [the sale] was not a good faith transfer for value, or was conditioned on the outcome of this appeal" (emphasis added). Reasoning from that assumption, the debtors argue that the recent sale *might be* subject to rescission in the event their appeal was successful. Therefore, the Manges debtors previously asked that we remand the case to the district court for discovery on the mootness issue; however, this court denied the request. Although we recognize that the "substantial consummation" test is generally fact-driven such that an evidentiary hearing on the issue would be necessary, there is a very important distinction in the case presented. Substantial consummation here is merely a sub-part of the overall mootness balancing test, as discussed above. Mootness is evaluated by the reviewing court, which may take notice of facts not available to the trial court if they go to the heart of the court's ability to review. *See Board of License Comm'rs v. Pastore,* 469 U.S. 238, 240, 105 S.Ct. 685, 686, 83 L.Ed.2d 618 (1985) ("When a [post-appeal] development ... could have the effect of depriving the Court of jurisdiction due to the absence of a continuing case or controversy, that development should be called to the attention of the Court *without delay.*"); *Clark v. K-Mart Corp.,* 979 F.2d 965, 967 (3d Cir.1992) (Unless reviewing court can receive facts relevant to mootness, "there [is] no way to find out

15

if an appeal has become moot."). Thus, this court may review evidence as to subsequent events not before the courts below which bears upon the issue of mootness. *E.g., Crystal Oil,* 854 F.2d at 81; *Roberts Farms,* 652 F.2d at 796.

Problems can arise, however, where the party opposing a motion to dismiss on mootness grounds contests the newly submitted evidence, as do the debtors here.[11] However, we need not concern ourselves with resolving any such evidentiary dispute in the context of our mootness determination—or remanding it to the bankruptcy court for resolution—because there is no real controversy as to the "facts" regarding the sale of the ranch. Seattle and SeaFirst have filed authenticated copies of the deeds of sale and sales agreements respecting the December 16 sale, and the co-trustees have stated under oath that these documents constitute the entire agreement between the Trust and the third-party buyers. Conspicuously absent from the papers before us is any affidavit or documentary evidence—other than sheer speculation by the debtors in their motion to remand—that the sale

---

[11]One district court, acting in its appellate function, was faced with a potentially viable challenge to certain affidavit evidence submitted in support of a motion to dismiss on the basis of mootness. *See Huddleston v. Nelson Bunker Hunt Trust Estate,* 102 B.R. 71 (N.D.Tex.1989). The court determined that the affidavit evidence was appropriately submitted and observed that:

> There may be disputes regarding evidence on the mootness question that are inapposite to the court's decision. If these disputes do not stand in the path of the district court's resolution of the mootness issue, the court need not remand the matter to the bankruptcy court.

*Id.* at 76 n. 9.

16

was somehow compromised in order to facilitate a finding of mootness. This silence is even more suspect in light of the fact that the debtors filed motions to stay in this court to suspend the sale at issue, never once having lodged the charges they make today.[12]

Seattle and SeaFirst urge us to take judicial notice of the unimpeached certified copies of the deeds and assignments executed by the Trust to the third-party purchasers contained in Seattle and SeaFirst's Record Excerpts, an invitation we accept. *E.g., Pratt v. Kelly,* 585 F.2d 692, 696 (4th Cir.1978); *see also* FED.R.EVID. 201; *cf. Landy v. FDIC,* 486 F.2d 139, 151 (3d Cir.1973) (taking judicial notice of court documents), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). We also take note of the properly authenticated sales agreements which fail to evidence any contingency upon the outcome of this appeal. From these documents, it appears that the "centerpiece" of this litigation has been irreversibly sold to third parties. Therefore, "it is very doubtful that effective relief could be afforded even if [the Manges debtors] prevailed on the merits." *In re Information Dialogues, Inc.,* 662 F.2d 475, 476 (8th Cir.1981) (per curiam). This factor alone weighs heavily in favor of a finding of mootness.

2. Other evidence of "substantial consummation"

---

[12]We cannot more accurately summarize the situation than did SeaFirst:

> For two years, the Manges Debtors played Cassandra, prophesying the fall of their kingdom should the ranch be sold; once the sale happened, they became King Lear, refusing to accept the fate they foresaw.

17

Even prior to the sale, the Trust spent millions of dollars improving, upgrading, and preparing the property for sale, countless hours in negotiation of the conveyance, and substantial amounts in appraisals, surveys, and other closing costs. The Trust additionally engaged in negotiations to renew gas production on the ranch mineral estate, to lease both the surface estate and mineral rights, and to dispose of litigation involving Trust assets. Significant amounts were paid to state taxing authorities to reduce the outstanding liability for property taxes on the ranch which had not been paid for several years. Millions of dollars in claims have been paid to date from the creditor fund established by Seattle and SeaFirst.

In sum, (i) the Trust "has transferred all or substantially all of the property proposed by the [P]lan to be transferred"; (ii) the liquidating trustees have assumed the business and management of all the property dealt with by the Plan; and (iii) the Trust has "commence[d] distribution under the [P]lan." 11 U.S.C. § 1101(2). Accordingly, the "substantial consummation" factor counsels convincingly against reviewing the merits of the debtors' challenge to the Plan.

C. The Effect upon Parties not before us

As several courts have made clear, "[s]ubstantial consummation of a reorganization plan is a momentous event, but it does not necessarily make it impossible or inequitable for an appellate court to grant effective relief." *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.),* 10 F.3d 944, 952 (2d

18

Cir.1993) (citing *AOV Industries,* 792 F.2d at 1148). Thus, we must also evaluate the other factors relevant to the mootness issue. With respect to the mootness factor relating to third parties, we reiterate that the ranch property and attendant mineral rights—by far the most substantial assets—have been sold to purchasers who are not before this court. Furthermore, as noted above, millions of dollars in administrative and priority claims have been paid to claimants not parties to this appeal. Millions more have been expended in preparing the property for the sale consummated in December of 1993. The Trust has significantly reduced *ad valorem* tax liabilities by entering into settlements with, and making distributions to, the claimant taxing authorities not participating in the appeal.

We must evaluate these transfers, many of which appear irreversible, against the backdrop of the relief sought—nothing less than a wholesale annihilation of the Plan.[13] All of these

---

[13]At oral argument, the Manges debtors' counsel argued for the first time that we might simply strike the offensive portion of the Plan without completely unravelling it. *See Bill Roderick Distrib., Inc. v. A.J. Mackay Co. (In re A.J. Mackay Co.),* 50 B.R. 756, 759-60 (D.Utah 1985) (holding that a bankruptcy court may modify a Chapter 11 plan after confirmation by deleting provisions that it did not have the jurisdiction to confirm). We disagree. The Bankruptcy Code provides that a plan may not be modified or amended after substantial consummation has taken place. 11 U.S.C. § 1127(b); *cf. Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.),* 92 B.R. 38, 46 (S.D.N.Y.1988) (observing that " "the piecemeal dismantling of [a plan of reorganization] ...' is, in practical terms, if nothing else, a virtually impossible task") (quoting *AOV Indus., Inc.,* 792 F.2d 1140, 1149 (D.C.Cir.1986)). In light of the facts that the Plan has been substantially consummated and that the tax provision is integral to the Plan as implemented, the requested modification is simply not possible.

third-party recipients and many others have relied upon the Plan, and the irretrievable depletion of estate assets would correspondingly decrease the amounts available to all claimants. In short, we doubt seriously that we could place the estate or the parties back into the *status quo* as it existed before the confirmation order if we were to unravel the Plan at this time. Therefore, we conclude that this factor weighs heavily against our interference at this late date.

D. Other Factors

Other factors particular to this case also counsel against our intervention. *See In re AOV Industries,* 792 F.2d at 1147-48 ("Determinations of mootness ... require a case-by-case judgment regarding the feasibility or futility of effective relief should a litigant prevail."). For example, even assuming the sale of the ranch and mineral rights could somehow be set aside, there is no reason to believe that the property would return to the debtors in the event we reversed the bankruptcy court's confirmation order on appeal. Rather, the ranch would return to SeaFirst, which voluntarily surrendered it to the Trust in order to obtain confirmation of the Plan, and the potential tax liability to the debtors occasioned by the sale on foreclosure would be resurrected.

Moreover, Seattle and SeaFirst have expended millions of their own funds—both in cash infusions and forbearance of administrative expenses—in reliance upon the Plan, much of which cannot be recovered. *See, e.g., Crystal Oil,* 854 F.2d at 82 (considering important the fact that a creditor which had made significant

20

sacrifices to obtain confirmation would lose benefits obtained in exchange if appellant successfully overturned plan). Further, if we were to reverse the Plan, the unsecured creditors would likely receive nothing for their claims because the portion of the creditor fund which remains will revert to Seattle and SeaFirst. Additionally, we presume that SeaFirst will reurge its $2 million administrative expense claims and rescind its voluntary subordination of its substantial unsecured debt. The extensive dismantling of this successfully executed Plan would be nothing short of a disaster for the bankruptcy court and the parties before it. These circumstances further persuade us that the instant appeal is prudentially moot.

### III. Conclusion

To summarize, the Plan has been virtually fully implemented, and, at this point, unravelling it would be virtually impossible. For the foregoing reasons, we hold that "it would be plainly inequitable for this court to consider the merits of [the Manges debtors' appeal]." *Crystal Oil,* 854 F.2d at 82. Accordingly, we dismiss the appeal.

APPEAL DISMISSED.