**In re McLEAN SQUARE ASSOCIATES, G.P., Debtor.**

**McLEAN SQUARE ASSOCIATES, G.P., Plaintiff,**

**v.**

**J.W. FORTUNE, INC., Defendant.**

Civil Action No. 96–287–A.
Bankruptcy No. 93–14161.
Adversary No. 94–1402–AB.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 30, 1996.

Ann E. Schmitt, Reed Smith Shaw & McClay, Washington, DC, for Plaintiff.

Henry St. John FitzGerald, Arlington, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This bankruptcy appeal involves three questions: 1) whether the parties' virtually complete compliance with a bankruptcy court's final Adversary Order moots petitioner's appeal; 2) whether the bankruptcy court had jurisdiction to enter that final order; and 3) whether the bankruptcy court properly excluded parol evidence.

## I.

Appellant, J.W. Fortune, Inc. ("Fortune"), and appellee, McLean Square Associates, G.P. ("MSA"), entered into a lease agreement on November 15, 1990. Under this agreement, Fortune leased retail space in McLean Square Center, a neighborhood shopping center owned and operated by MSA. At the time, McLean Square Center consisted of three separate complexes or parcels: a "Strip" or row of retail stores and restaurants, a "Mall Building" with retail and restaurant space on the first floor and commercial (office) space on the second floor, and "Boston Corner," a two-story retail building adjacent to the Strip and the Mall Building. McLean Square Center's tenants primarily included small, local retailers and restaurants.

At the time the lease agreement was executed, MSA already anticipated renovating and redeveloping the property. In contemplation of this, the parties' lease agreement contained a provision on Future Redevelopment. This provision, Section 3, provided, in pertinent part, that:

Tenant acknowledges that Landlord may wish to redevelop the Shopping Center at some future time. If construction for said redevelopment commences during the term of this Lease and directly affects the Leased premises, Landlord shall give Tenant six (6) months written notice (a) of the date on which redevelopment construction will render the premises untenantable, and (b) of the comparable space within the Shopping Center to which Tenant may relocate (the "Alternative Premises").

Moreover, a drawing of a proposed redevelopment plan was attached to the lease agreement as Exhibit A. Importantly, this rendering of the prospective construction project contained a written caveat, which stated that: "This site plan is subject to changes". Representatives for both MSA and Fortune initialed Exhibit A immediately beside this caveat.

In December 1990, one month after the parties had executed the lease agreement, they amended it, in part, to define the phrase "redevelopment and/or expansion" as any "physical construction work involving a veri-

fiable minimum total capital outlay of" one million dollars. The amended lease agreement also contained an integration clause. Pursuant to this amended lease agreement, Fortune established and operated a restaurant in the Strip section of McLean Square Center.

Less than two years later, on October 6, 1993, MSA filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et al.* During the ensuing reorganization process, MSA apparently recognized a need to secure an "anchor" tenant to increase business at the McLean Square Center, which was its primary asset. Accordingly, in June 1994, MSA began negotiations with Sutton Place Gourmet ("Sutton Place"), a popular, regional chain of gourmet grocery-stores. These negotiations culminated in a July 1995 lease agreement that required MSA, *inter alia*, to demolish approximately one-half of the Strip, build a "cold shell"[1] for Sutton Place, replace the Strip's facade, and resurface the parking lot.

In anticipation of a prospective Sutton Place lease, and pursuant to the Future Redevelopment provisions in its prior leases, MSA notified Fortune and certain other tenants during the summer of 1994 that redevelopment of the complex would soon commence and that, as a result, the premises these tenants occupied would become untenantable. As required by the leases, MSA also offered these tenants alternative premises in McLean Square Center. Some tenants accepted, but Fortune and other lessees rejected this offer. Specifically, they questioned the applicability of the Future Redevelopment provisions and objected to the suitability of the alternative premises.

Given Fortune's and the other two tenants' intransigence, MSA, in September 1994, filed a complaint against them in the Bankruptcy Court for the Eastern District of Virginia,

seeking a declaratory judgment that the proposed renovation and expansion of McLean Square Center fell within the Future Redevelopment provisions of the leases agreements. In particular, MSA wanted the bankruptcy court to order the three dissenting lessees to vacate their lease spaces and to relocate to the alternative premises.

MSA eventually settled with the other two tenants, but its case against Fortune proceeded to trial on May 5, 1995. At the close of evidence, the bankruptcy court continued the hearing to May 16, the date scheduled for the hearing on the confirmation of MSA's Chapter 11 reorganization plan. Then, on May 22, after this joint hearing itself was continued, the bankruptcy court determined that the proposed renovation and expansion fell within the Future Redevelopment provision and that, as a consequence, the amended lease agreement obligated Fortune to relocate its restaurant to the comparable alternative premises.

At the same time, with the bankruptcy court's encouragement, Fortune and MSA agreed to a series of lease modifications which reduced the base rent and provided for free rent during the relocation period. In addition, MSA agreed to relocate Fortune's kitchen equipment and to replace any equipment that could not be transferred or that failed to meet any applicable code as a result of the move. MSA also agreed to contribute to the cost of Fortune's payroll during the period in which the restaurant was closed for relocation, and it had previously agreed to perform the tenant improvements using Fortune's kitchen design. The bankruptcy court's Adversary Order dated August 15, 1995 ("Adversary Order"), which is the subject of this appeal,[2] reflects these various rulings and agreements.

Fortune appealed the bankruptcy court's ruling but did not seek a stay of the Adver-

---

1. Typically, an agreement for a "cold shell" merely obligates the landlord to construct the outside walls and the roof. The lessee remains responsible for interior improvements, such as heat and air conditioning, as well as specialized needs, including partition walls, fixtures, etc.

2. The Adversary Order, while extensive, did not address the layout of the restaurant's dining

area. When MSA and Fortune failed to reach agreement as to the design, MSA filed a motion seeking to clarify the ruling on that particular matter. Prior to the hearing on the motion, the parties agreed on a design, which was then incorporated into a second bankruptcy court order, entered on July 18, 1995. This design order is not at issue here.

sary Order. As a consequence, following the entry of the Adversary Order and the order confirming MSA's plan of reorganization, MSA proceeded with the redevelopment of McLean Square Center. Thus, Fortune vacated its premises, and MSA demolished approximately one-half of the Strip, including the space formerly occupied by Fortune. In July 1995, MSA began demolition and construction work on the new Fortune premises, which were completed sometime that autumn at a cost of almost $300,000. Since then, MSA has completed construction of the "cold shell" at the former Fortune site and delivered the new and improved space to Sutton Place, which immediately commenced work on the interior and tenant improvements.[3]

Now, in this appeal, Fortune challenges the ruling of the bankruptcy court on two independent grounds: (1) that the bankruptcy court lacked jurisdiction to enter the final Adversary Order because MSA's declaratory judgment action was a non-core matter; and (2) that the bankruptcy court erred in denying Fortune the opportunity to introduce extrinsic, or parol, evidence of the parties' intended meaning of the provision on Future Redevelopment in the lease agreement. MSA opposes these two arguments and, in addition, contends that the events occurring subsequent to the bankruptcy court's entry of the Adversary Order have rendered this appeal moot.

## II.

■ Mootness is the threshold issue. Generally, in bankruptcy appeals, the doctrine of mootness involves constitutional as well as equitable considerations. *See Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.,* 841

F.2d 92, 95–96 (4th Cir.1988) (applying both constitutional and equitable mootness principles to an appeal challenging a bankruptcy court's order confirming a reorganization plan). In the final analysis, Fortune's appeal of the bankruptcy court's Adversary Order stemming from MSA declaratory judgment action runs afoul of both mootness doctrines.

■ The constitutional doctrine of mootness ensures that federal courts refrain from rendering judgments, or advisory opinions, in expired disputes unlikely to recur. As recently explained by the Supreme Court, Article III's "case or controversy" requirement dictates that "[when] an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed." *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)). In other words, an appeal should be deemed moot in the constitutional sense whenever the judicial determination sought would have no practical effect. Thus, it is well established that courts must dismiss an appeal as moot if an affirmance "would ostensibly require something to be done which had already taken place," while a reversal "would ostensibly avoid an event which had already passed beyond recall." *Brownlow v. Schwartz,* 261 U.S. 216, 217–18, 43 S.Ct. 263, 264, 67 L.Ed. 620 (1923). Put colloquially, the governing principle is simply that courts should not engage in the useless task of closing the barn doors after the horses have fled. Cases reflecting this principle are legion.[4]

---

3. Meanwhile, in August 1995, Fortune's rent check was returned to MSA because of "insufficient funds." MSA refused to accept a substitute check and instead filed an action for unlawful detainer in Fairfax County District Court. Fortune removed the action to the Fairfax County Circuit Court, and trial was scheduled for April 24, 1996. On March 20, 1996, however, Fortune filed its own Chapter 11 petition. MSA then filed a motion for relief from the automatic stay to allow it to proceed with the state court action. The disposition of that motion, if any, is neither included in the record of this appeal, nor relevant to its disposition.

4. Where an appellant fails to seek a stay of an order, mootness may occur (i) by virtue of subsequent events or (ii) because the order has been carried out. For cases illustrating the former, *see, e.g., Farmers Bank v. Kittay (In re March),* 988 F.2d 498, 499 (4th Cir.), *cert. denied,* 510 U.S. 864, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993) (holding that foreclosure on the property at issue "rendered moot any appeal on the applicability of the [11 U.S.C.] § 362(a) stay"); *Sullivan Central Plaza, I, Ltd. v. BancBoston Real Estate Capital Corp. (Matter of Sullivan Central Plaza, I, Ltd.),* 914 F.2d 731, 733 (5th Cir.1990) (determining that "[i]f the debtor fails to obtain a stay,

■ Equitable mootness, as its name might imply, is more flexible than its constitutionally-based cousin. In essence, it enables courts to dismiss appeals from orders confirming reorganization plans, even if effective relief could be fashioned, in order to avoid inequitable or unfair results. As defined by the Fourth Circuit, equitable mootness occurs "when implementation of the [reorganization] plan has created, extinguished or modified rights, particularly of persons not before the court, to such an extent that effective judicial relief is no longer practically available." *Central States, Southeast and Southwest Areas Pension,* 841 F.2d at 96. Thus, whereas mootness in the constitutional sense involves the courts' "inability" to affect outcomes, equitable mootness deals with the courts' "unwillingness" to do so. *See Matter of UNR Industries, Inc.,* 20 F.3d 766, 769 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 509, 130 L.Ed.2d 416 (1994) (discussing the distinction between the doctrines of constitutional and equitable mootness). This broader doctrine has been widely accepted and applied.[5]

■ Both doctrines point convincingly to the mootness of this appeal. As the record reflects, Fortune and MSA have, in effect, fully obeyed the bankruptcy court's Adversary Order,[6] a result that Fortune may have avoided by obtaining a stay pursuant to 11 U.S.C. § 362(a). For example, Fortune vacated its prior premises, which MSA then demolished and used to erect the "cold shell" for Sutton Place, an unrelated third party. Sutton Place, which substantially renovated the premise's interior section, now occupies it. Moreover, MSA spent approximately $300,000 in preparing the alternative premises for Fortune in accordance with the lease agreement and the Adversary Order. Specifically, MSA removed asbestos from the new space, relocated Fortune's kitchen equipment, replaced any equipment that could not be transferred or no longer satisfied requisite safety and health codes, and abated Fortune's rent for the period of construction.

Thus, from a constitutional standpoint, Fortune's appeal is moot because events have overtaken the appeal; or put another way, disposition of the appeal cannot affect the order because it has already been carried out. In effect, neither an affirmance nor a

---

and if the property is sold in the interim, the district court will ordinarily be unable to grant any relief"), *aff'd on reh'g,* 935 F.2d 723 (1991); *Lashley v. First National Bank of Live Oak (In re Lashley),* 825 F.2d 362, 364 (11th Cir.1987) (finding an appeal moot "when a debtor does not obtain a stay pending appeal of a bankruptcy court . . . and allowing a creditor to foreclose on property"), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1051, 98 L.Ed.2d 1013 (1988); *A & H Holding Corp. v. O'Donnell (In Matter of Abingdon Realty Corp.),* 530 F.2d 588, 590 (4th Cir.1976) (affirming the district court's dismissal of an appeal because "[n]o stay of the effectiveness of the orders of the bankruptcy judge was sought by A & H, its receiver in bankruptcy, or anyone else, and the [foreclosure] had been consummated"). For cases illustrating the latter, *see, e.g., United States v. Board of Ed. of the City of New York,* 543 F.2d 1, 3 (2nd Cir.1976) (finding an appeal moot "by the fact that all of the [parties], save one, have complied with or are in the process of complying with the District Court order"); *Western Addition Community Org. v. Alioto,* 514 F.2d 542, 544 (9th Cir.) (dismissing an appeal because the parties' compliance with the district court's order deprived the Court of its jurisdiction), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *Gilliam v. School Board of City of Hopewell, Va.,* 332 F.2d 460, 461 (4th Cir.1964) (dismissing an appeal of an order requiring the admission of black pupils to certain schools "since there has been full compliance with [it]").

5. *See e.g., In re Continental Airlines,* 91 F.3d 553 (3rd Cir.1996); *Resolution Trust Corp. v. Best Products Co., Inc. (In re Best Products Co., Inc.),* 68 F.3d 26, 29 (2nd Cir.1995); *Manges v. Seattle–First Nat'l Bank (Matter of Manges),* 29 F.3d 1034, 1038–39 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1105, 130 L.Ed.2d 1071 (1995); *Rochman v. Northeast Utils. Serv. Group (In re Public Serv. Co. of New Hampshire),* 963 F.2d 469, 471–72 (1st Cir.), *cert. denied,* 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992); *In re AOV Industries, Inc.,* 792 F.2d 1140, 1147 (D.C.Cir.1986); *Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.),* 652 F.2d 793, 796–97 (9th Cir.1981).

6. In only one relatively minor respect can it be said that the Adversary Order has not been carried out. MSA has not yet made any payment towards Fortune's payroll because Fortune has neither requested reimbursement nor provided MSA with any information regarding the amount owed. MSA has requested this information and stands ready, willing, and able to tender the required payment at any time. Notwithstanding this minor point, the parties have complied with the Adversary Order in all other respects.

reversal of the Adversary Order would have any practical effect because the directions mandated by the Adversary Order have already "passed beyond recall." *Brownlow,* 261 U.S. at 217, 43 S.Ct. at 264. Because no outcome can return the parties to *status quo ante,* the appeal presents no case or controversy and is therefore moot.

Alternatively, from an equitable perspective, Fortune's appeal is equally moot under the doctrine of equitable mootness. Although courts have applied the doctrine of equitable mootness solely in appeals involving orders confirming a debtor's reorganization plan, the appeal at issue is so closely related, if not entwined, with MSA's plan that application of this doctrine seems consistent with, if not compelled by, the doctrine. For instance, were Fortune's appeal to succeed, the purpose of MSA's reorganization plan, which involved obtaining an anchor for McLean Square Center, would be left in tatters. Fortune's success on appeal would also seem to involve ordering Sutton Place, a third party, to vacate the disputed premises. Such a result not only contradicts the logic of MSA's reorganization plan but also unfairly impairs the rights of a third party that has expended considerable time, effort, and resources in improving the space's interior.

In sum, the appeal at issue is moot on equitable as well as constitutional grounds.

### III.

Even assuming, *arguendo,* the survival of Fortune's appeal, it nevertheless fails on the merits. The first merits dispute involves Fortune's challenge to the bankruptcy court's jurisdiction to enter the Adversary Order. Specifically, Fortune argues that MSA's declaratory judgment action constituted a non-core related proceeding for which the bankruptcy court needed, but did not obtain, its consent to enter any final order. This contention fails.

Like other federal courts, federal bankruptcy courts possess limited jurisdiction. Under 28 U.S.C. § 157, bankruptcy litigation is separated into three distinct categories: (1) core proceedings, (2) non-core related proceedings, and (3) non-core unrelated proceedings. *Canal Corp. v. Finnman (In re Johnson),* 960 F.2d 396, 399 (4th Cir.1992). Bankruptcy courts are authorized to enter appropriate orders and judgments in core proceedings. 28 U.S.C. § 157(b)(1). They also may hear non-core related proceedings, but they may not enter final orders absent reference from the parent district court as well as the consent of each party. *Id.* at § 157(c)(2). If either of these statutory conditions are absent, the bankruptcy court may only issue proposed findings and recommendations to the district court. Finally, a bankruptcy court may not even hear, let alone issue orders in, non-core unrelated matters.

The statute's definitions of core and non-core related proceedings are quite opaque. According to the statute, bankruptcy courts have authority to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . ." *Id.* at § 157(b)(1). Essentially, a core proceeding connotes those actions created or determined by a provision of title 11 or matters that can only arise in the context of a bankruptcy case. *Wood v. Wood (Matter of Wood),* 825 F.2d 90, 96–97 (5th Cir.1987); 1 *Collier Bankruptcy Manual* § 3.01 at 3–37 (3d ed. 1993). A non-exhaustive list of examples is set forth in the statute at § 157(b)(2). On the other hand, a non-core related proceeding exists independently of title 11 and the particular bankruptcy case at issue but nevertheless affects the outcome. *Matter of Wood,* 825 F.2d at 97.

MSA maintains and Fortune disputes that the bankruptcy court possessed core proceeding jurisdiction to hear and rule upon the declaratory action. As it happens, the invitation to resolve this knotty dispute may be declined, for there is a simpler way to resolve it.[7] It is, simply put, that even if the

---

7. A "core/non-core" inquiry would force the Court to tread the narrow tightrope of constitutional limitation enunciated by the Supreme Court in the landmark case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In that case, the Supreme Court invalidated the precursor bankruptcy jurisdiction provision because it enabled a non-Article III court to pass judgment on state law claims. Instead of proceeding along the difficult, unnecessary path of determining whether MSA's declaratory action

matter is non-core, it is nonetheless a related non-core matter as to which jurisdiction to enter a final order may be conferred by consent.

■ As noted, § 157(c)(2) authorizes bankruptcy courts to enter final orders in non-core related proceedings if the district court referred the matter and the parties consented to this power. 28 U.S.C. § 157(c)(2). Two of these requirements are easily met here. First, MSA's declaratory judgment action plainly qualifies as a non-core related proceeding because of its potential effect on both McLean Square Center, the estate's primary asset, and the reorganization plan, which included the lease agreement with Sutton Place. Second, the Eastern District of Virginia automatically refers cases related to or arising under title 11 to the bankruptcy courts. *Order of Reference*, No. 20 (E.D.Va. July 13, 1984).

The third requirement—consent—is more complex. This circuit, as well as many others, sensibly hold that a party, who fails to object to a bankruptcy court's jurisdiction over a non-core related matter until after the entry of an unfavorable order, has impliedly consented to the court's power.[8] The record supports a finding of consent. For example, Fortune failed to raise the core/non-core issue in its answer,[9] at the pretrial hearing, in a status letter to the Court, in the Memorandum for Hearing it filed the day before trial, and at the trial itself. Moreover, Fortune executed and consented to the entry of a Stipulation Governing Confidential Material and to entry of the Adversary Order. In fact, Fortune did not initially complain about jurisdiction until its Designation of Issues on Appeal. Thus, Fortune impliedly consented

to the entry of a final judgment by the bankruptcy court.

As a consequence, the bankruptcy court did, indeed, possess the appropriate jurisdiction to enter the final Adversary Order.

## IV.

Fortune's second attack on the merits stems from the bankruptcy court's refusal to permit the introduction of extrinsic evidence regarding the parties' intent with respect to the 1990 lease agreement. Specifically, Fortune argues that the parties understood the term "redevelopment" to include only the previous plan of construction attached to the lease agreement, notwithstanding the fact that the lease agreement contains no such limitation and even states that the proposed redevelopment plan "is subject to changes." According to Fortune, the fact that the redevelopment provision is unambiguous does not preclude the introduction of evidence as to the parties' intent. This contention is also meritless.

■ It is too well-settled to be disputed in Virginia and elsewhere that courts may not search for a term's meaning beyond the four corners of a complete, unambiguous instrument. *See, e.g., Lumbermen's Mut. Cas. Co. v. Keller*, 249 Va. 458, 460, 456 S.E.2d 525, 526 (Va.1995); *Management Enterprises, Inc. v. Thorncroft Co., Inc.*, 243 Va. 469, 472, 416 S.E.2d 229, 231 (Va.1992). Indeed, the Supreme Court of Virginia has expressly rejected the precise position advanced by Fortune:

> [Appellants] ask us to adopt a rule permitting extrinsic evidence of the intentions of contracting parties, regardless of the clarity of the contract language. We decline

---

constituted a core proceeding or an independent state law claim, the Court elects to pursue a less complicated, clearer resolution to this jurisdictional issue.

8. *See, e.g., In re Johnson*, 960 F.2d at 403; *see also Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993); *Men's Sportswear, Inc. v. Sasson Jeans, Inc. (In re Men's Sportswear, Inc.)*, 834 F.2d 1134, 1137–38 (2nd Cir.1987); *Daniels–Head & Assoc. v. William M. Mercer, Inc. (In re Daniels–Head & Assoc.)*, 819 F.2d 914, 918–19 (9th Cir.1987); *DuVoisin v. Foster (In re South-*

*ern Indus. Banking Corp.)*, 809 F.2d 329, 331 (6th Cir.1987).

9. MSA notes that its declaratory judgment complaint contained the allegation that it constituted a core matter. Accordingly, because Fortune did not deny this allegation in its answer, Fortune can be deemed to have admitted that particular point. *See* Fed.R.Bank.P. 7008(d) (stating that averments in pleadings to which responsive pleadings are required should be considered admitted when not denied).

the invitation. We adhere to the "plain meaning" rule in Virginia....

*Berry v. Klinger,* 225 Va. 201, 208, 300 S.E.2d 792, 796 (Va.1983) (citing *Globe Iron Const. Co. v. First Nat. Bank of Boston,* 205 Va. 841, 848, 140 S.E.2d 629, 633 (Va.1965)).

 Here, Exhibit A to the November 1990 lease agreement unambiguously states that the plan set forth was subject to changes. Given this clear statement, Fortune cannot now argue—and introduce evidence tending to show—that the parties intended that only the plan set forth in Exhibit A would constitute "redevelopment" within the Future Redevelopment provision of the lease. The bankruptcy court committed no error in rejecting Fortune's proffered testimony to that effect; to the contrary, admitting the testimony would have violated settled principles of contract law.

The appeal should be dismissed as moot or, alternatively, on the merits.